## Ison, et al. v. Sanders.

(Decided March 18, 1915.)

## Appeal from Pike Circuit Court.

1. Reformation of Instruments—Mistake—Equity.—Under the general principles by which courts of equity are guided, a person who seeks to rectify a deed on the ground of mistake must establish, in the clearest and most satisfactory manner, that the alleged intention to which he desires it to be made conformable continued concurrently, in the minds of all parties, down to the time of its execution; and also, he must be able to show exactly and precisely the form to which the deed ought to be brought.

2. Reformation of Instruments.—To reform a contract, and then enforce it in its new shape, calls for a much greater exercise of the power of a chancellor than simply to set the transaction aside. Reformation is a much more delicate remedy than recission.

3. Reformation of Instruments.—In order to justify a decree for reformation in cases of pure mistake, and in the absence of fraud, it is necessary that the mistake should have been mutual. Where the mistake has been on one side only, the utmost that the party desiring relief can obtain is rescission, not reformation.

4. Reformation of Instruments.—In no case will a court declare an alteration in the terms of a duly executed contract, unless the proofs are full, clear and decisive; mere preponderance of evidence is not enough; the mistake must appear beyond reasonable controversy.

5. Contracts—Rescission—Warranty.—In the absence of fraud, insolvency or non-residence of a vendor, a vendee, in peaceable

possession of land, under a deed containing a covenant of general warranty, is not entitled to a rescission of the contract when sued for the purchase money, although the vendor may have represented his title as perfect, when, in fact, it was not. In such a case the vendee must pay the purchase money and rely upon the covenant of warranty in case of an eviction.

6.  Contracts—Rescission.—In enforcing the equitable right of rescission, a court of chancery will, as the necessities of the case require, afford relief either by directing a reconveyance, or simply by ordering the instrument to be surrendered for cancellation. This relief is based upon equities which arise out of fraud and mistake.

7.  Cancellation of Instruments—Rescission.—Cancellation of the purchase money notes which are outstanding, or injunction against their collection, unless they have passed into the hands of a bona fide holder in the course of trade, as well as recovery of the portion of the purchase money already paid, is proper relief to be awarded on a decree for rescission at the suit of the vendee.

8.  Vendor and Purchaser—Relief to Purchaser—Taxes Paid and Improvements.—As a condition upon granting relief to a vendee, he should restore his vendor, as far as possible, to the position which he occupied before the transaction. This requires the vendee to account for the use and occupation of the land, and for any waste committed by him; and the vendee is entitled to a return of his purchase money, with interest, and any taxes paid and improvements put upon the land to the extent that they have increased the vendible value of the land; and to the extent that these credits exceed the charges against the vendee, he is entitled to a lien upon the land.

CHILDERS & CHILDERS for appellants.

ROSCOE VANOVER and E. J. PICKLESEIMER for appellee.

OPINION OF THE COURT BY CHIEF JUSTICE MILLER— Reversing.

On April 6th, 1912, the appellee, J. M. Sanders, sold to the appellants, Sam T. Ison and Alice Ison, his wife, 279 acres of land, lying on Beef Hide Creek, in Pike County, for $6,000.00.

Of the purchase price, $2,400.00 has been paid, and the remaining $3,600.00 was represented by two purchase money lien notes, one for $100.00, payable on demand, and the other for $3,500.00, payable on or before January 31st, 1913.

The two notes above mentioned were not paid at their maturity, and on May 6th, 1913, Sanders brought this

suit, seeking to enforce his vendor's lien, and a sale of the property to pay the debt.

By the terms of his deed, Sanders covenanted with the Isons that he would warrant the title to the land conveyed to them excepting, however, from the conveyance all the timber on said land which theretofore had been branded "J. O.," and sold to other parties.

For answer, Ison and wife set up the covenant of general warranty in the Sanders deed, and the breach thereof by alleging that Sanders had purchased said land from R. L. Mullins, and that on December 16th, 1902, Mullins, while he was the owner of said land, and before he had sold it to Sanders, sold all the coal, oil, gas, salt water, fire and potter's clay, all timber necessary for mining purposes, all slate, stove, subterranean substance, iron ore, and all the mineral and mineral substances in, upon, and under said lands, together with a right-of-way for railroads, tram-roads, pipe lines and any and all roads and ways necessary for the removing or manufacturing of any or all of said minerals, to the Northern Coal & Coke Company, and had executed and delivered to said company a deed containing covenants of general warranty, for all of said minerals, rights and substances, as above set out; that said conveyance of the mineral and mining rights to said Northern Coal & Coke Company was made before Sanders bought the land, and that Sanders did not, at the time he sold the land to Ison, or at any time, own, or have title to, any of the mineral substances, rights and privileges above enumerated; and defendants averred that they have never had possession, and cannot obtain possession, of said mineral rights, which were then, and now are, in the possession of the Northern Coal & Coke Co., or its assignees, whose title was superior and paramount to the title of the Isons.

The answer further alleged that the minerals under said land composed the chief value of the land, and the Isons bought the land, believing they would and did acquire, by the deed from Sanders, a good and complete title to all of such mineral rights, and that Sanders represented and warranted to the Isons that he had title, and was the owner of all of said mineral rights at the time he made said conveyance to them; that these statements by Sanders were false and untrue, and known to be so by him at the time he made them, and that San-

ders made said representations to the Isons for the purpose of deceiving and inducing them to buy said property; that the Isons relied upon said statements and believed them to be true, and bought the property upon the belief that they were true, and believing that they were getting a good and merchantable title to said land, including said mineral rights; that if they had known at the time they bought said land that the mineral rights had been sold and conveyed, and severed from the land, they would not have bought it; that the mineral rights were at the time of the sale to Ison worth $5,000.00, and constituted five-sixths of the value of the fee of said land; and that Sanders was insolvent and had no property in Kentucky subject to execution.

The Isons asked that the petition be dismissed; and by way of counter-claim, that they recover of Sanders the sum of $1,400.00 for breach of his covenant of warranty, as above set forth.

The reply traversed the affirmative allegations of the answer; and, admitting that the mineral rights had been sold by Mullins at the time alleged in the answer, the reply alleged that the sale by Mullins to the Northern Coal & Coke Co. was well known to the Isons previous to the time they bought the land in question, and that the mineral rights formed no part of the consideration for which the notes, or either of them, were executed; that the notes sued on were executed by Ison and the cash payment made for the surface of said land alone, which was well worth the sum of $6,000.00; and that by oversight and mistake of Sanders in writing the deed, the mineral rights were not excepted out of said deed, but should have been so excepted, under the contract of sale.

The reply asked that said deed be corrected so as to conform to the contract between the parties, by excepting and excluding the mineral rights from the terms of the deed, and that the contract as reformed be enforced.

In an amended answer the Isons allege they did not know that Sanders did not own the mineral rights at the time they bought the land from Sanders; that they contracted to pay Sanders $6,000.00 for said land and minerals, in fee, and had paid $2,400.00 of said amount; that by reason of the defects in his title to said land, as set forth in the original answer, it was now impossible for Sanders to comply with the covenants of his deed; that

the minds of the contracting parties had never met in reference to the subject matter of the said transaction, and that the contract was, therefore, unenforcible; and they asked that the contract be rescinded.

The Isons offered to re-convey said land to Sanders, and asked judgment against Sanders for $2,400.00, the amount of the purchase price theretofore paid on said land, with interest from the date of the deed.

The uncontradicted proof sustains the charge of Sanders' insolvency.

By his judgment the chancellor held that the Isons bought the land with knowledge that the coal and mineral rights thereunder had been sold; that they bargained only for the surface of said land, and that they understood they were getting the surface only for $6,000.00.

Judgment was, therefore, entered in favor of Sanders against the Isons for the $3,600.00 unpaid purchase money, with interest, without any attempt to correct the deed, and the land was directed to be sold to pay the debt.

The judgment contained, however, this further provision:

"It is further adjudged by the court that the defendants, Sam T. Ison and Alice Ison, recover of the plaintiff, J. M. Sanders, on their counter-claim, the sum of a hundred dollars as nominal damages for the breach of warranty in the deed from J. M. Sanders and Elizabeth V. Sanders to Sam T. Ison and Alice Ison, for the land above described, by reason of said deed failing to except the coal and minerals, &c., from the said land above stated, the same having been prior to the making of said deed (the deed for said coal and mineral being recorded in the Pike County Court Clerk's office at the time of the sale from plaintiff to defendants), together with their costs herein expended. It is further adjudged that said amount shall go as a credit on the judgment of the plaintiff against the defendant, Sam T. Ison."

The effect of the judgment was to enforce Sanders' lien under the covenant of his deed as written, and to sustain Ison's claim for damages against Sanders for a breach of that covenant.

From that judgment the Isons prosecute this appeal.

The two issues, therefore, are, (1) upon the reformation of the deed as asked by Sanders, and (2) upon a rescission of the contract as asked by the Isons.

1. Giving the allegations of the reply their legitimate meaning and effect, and treating the prayer for a reformation as proper in the reply, for the purposes of this case, it goes no further than to say that the oversight and mistake was made by Sanders in writing the deed; it is nowhere alleged that the mistake was mutual, or that either of the Isons made any mistake or oversight, or perpetrated any fraud upon Sanders.

The general rule upon the subject of reforming executed contracts is stated as follows in Bispham's Principles of Equity, Section 469:

"The nature of mistake and fraud has been attempted to be explained in former chapters. What we have to do with now is the method in which the court applies the equitable remedy of reformation, for the purpose of redressing injuries growing out of mistake or fraud.

"The general principles by which the court is guided in such cases are well settled. A person who seeks to rectify a deed on the ground of mistake must establish, in the clearest and most satisfactory manner, that the alleged intention to which he desires it to be made conformable continued concurrently, in the minds of all parties, down to the time of its execution; and, also, must be able to show exactly and precisely the form to which the deed ought to be brought.

"To reform a contract, and then enforce it in its new shape, calls for a much greater exercise of the power of a chancellor than simply to set the transaction aside. Reformation is a much more delicate remedy than rescission. Hence, in order to justify a decree for reformation in cases of pure mistake, it is necessary that the mistake should have been mutual. Where the mistake has been on one side only, the utmost that the party desiring relief can obtain is rescission, not reformation. The case is, of course, different if any element of fraud exists; for it has been properly held that where there is a mistake on one side, and fraud on the other, there is a case for reformation."

In referring to the character and amount of testimony necessary to reform an executed instrument this court, in Coleman v. The Illinois Life Ins. Co., 26 Ky. L. R., 900, 82 S. W., 616, said:

"As to the nature and amount of evidence required we find the rule thus stated in Royer Wheel Co. v. Miller, 14 Ky. L. R., 831: 'The mistake must be clearly estab-

lished by the proofs; * * * indeed in no case will a court decree an alteration in the terms of a duly executed contract unless the proofs are full, clear and decisive; mere preponderance of evidence is not enough; the mistake must appear beyond reasonable controversy.' (Mattingly v. Speak, 4 Bush, 316; Stackhoff v. Brannin, 14 Ky. L. R., 717.)

"Accepting the foregoing as the correct rule, it necessarily follows that a direct conflict of testimony is conclusive against the reformation of a deed."

In Griffith v. York, 152 Ky., 16, we said:

"It is well settled that, where a mistake has been made by a draftsman, in the preparation of a deed, equity will afford relief by directing the reformation of the instrument so as to carry out the intention of the parties. Nutall v. Nutall, 26 Rep., 671; Dean v. Hall, 31 Rep., 1306. But, in order to entitle one to relief of this character, the evidence, by which the alleged mistake is established, must be clear and convincing. Whitt v. Whitt, 145 Ky., 367. Where the evidence is conflicting, the relief will not be granted, even though a preponderance of the evidence supports the allegation of mistake. Payne v. Sebree, 14 Rep., 862."

See also Kolb v. Dubois, 150 Ky., 92; Bennett Jellico Coal Co. v. East Jellico Coal Co., 152 Ky., 838; Lindenberger v. Rowland, 158 Ky., 760.

The same rule is laid down in Pomeroy's Equity Jurisprudence (3 Ed.), Section 859.

Bearing this rule in mind, we will briefly examine the evidence upon the question of the mistake between the parties. It is rather brief and limited in its scope.

The appellee, Sanders, testified that appellant, Sam Ison, came to his house early one morning, and asked him if he wanted to sell his farm, and that he told Ison he did not, as it was a little late in the season; that he had talked of selling it; that Ison said if he wanted to sell it they would look over the land and see if they could make a trade; that they walked out into the yard, and Sanders pointed out to Ison the boundary of the farm, saying he had 279¾ acres "according to the mineral deed—the way the mineral was sold;" that they went over the land that afternoon and talked prices, and that Ison talked as though Sanders asked too much for his land.

Sanders further testified that Ison went across the branch to Ira Ison's and stayed all night, and talked with Ira and his father, Alex Ison, about the trade; that the next morning Sam Ison came back to Sander's place and again talked of the trade, whereupon Sanders made him a price of $6,000.00; that the two walked together down in the bottom below the house, where Ison said he would trade if Sanders would give him a little time— until the first of the year—and that Sanders agreed to give him the time; that while they were down in the bottom Ison asked Sanders "if the mineral deed carried a right-of-way for the railroad," and that Sanders told Ison he did not know, that he had never read the mineral deed; that it was sold at the same time the Greer's mineral was sold, and he supposed it was about the same as the others.

After returning to the house, Sanders and Ison finally agreed on the trade, and Sanders sent a boy for the deputy clerk, H. J. Moore; and while Moore was coming Sanders wrote the deed. When Moore came Ison said the deed should be read to Sanders and his wife, and Sanders started to hand the deed to Moore for that purpose; but Moore said his eyes were bad, and he asked. Sanders or some one else to read it; that Sanders read the deed, and when he had read down to the place in the deed where it described the number of acres as 279, Sanders says he remarked, in Ison's presence, "that that was not the exact amount; there were 279¾ acres *the way the mineral* was sold;" whereupon Ison said that was all right. The parties then signed the deed and acknowledged it before Moore, and it was delivered to Ison.

Sanders further testified that his failure to except the mineral rights from the deed was the result of an oversight upon his part, and that it was understood between him and Ison that the mineral rights had theretofore been sold.

When Moore, the clerk, was asked to tell what happened on the occasion of his taking the acknowledgment to the deed, he answered as follows:

"Yes, sir; there was something said about the minerals when the deed was made. At that time my eyes were bad, so Mr. Sanders read the deed; when he come to the number of acres that was in the deed and he had placed it at 280 acres, I believe, and he stopped reading

there and said, 'that the mineral deed or the mineral men,' I am not positive which he said, 'contained 279¾ acres.' "

"Q. Who was Mr. Sanders talking to at the time he was talking about the mineral deed? A. He was talking to Mr. Ison. Q. Did Mr. Ison make any reply? A. No, sir."

Alonzo Sanders, the sixteen-year-old son of appellee, testified as follows:

"I was present and heard part of the conversation between the parties when they were talking about the trade. Alice Ison was not present. When they were talking over the trade the plaintiff (said) to the defendant, Sam T. Ison, that the mineral was sold on this tract of land, and also the timber branded 'J. O.' I heard the plaintiff state when the deed was read that there was 279¾ acres according to the mineral deed. Sam T. Ison was present at that time. After the defendant, Sam T. Ison, moved on the farm I was talking with him and asked him what the land would be worth if it was level and the mineral and timber still belonged to the land; and he said he would be as rich as he would want to be."

Nellie Sanders, the fourteen-year-old daughter of the appellee, testified as follows:

"I was present and heard part of the conversation when the plaintiff, J. M. Sanders, sold his farm to Sam T. Ison. When the land was sold I heard my father tell Sam T. Ison that there was 279 acres the way the mineral was run out. He also told him all the timber branded 'J. O.' was sold."

It was further shown by several witnesses that it was generally understood and known in the neighborhood where Ison and Sanders lived, near the land in question, that all the mineral rights in that vicinity had been sold to the Northern Coal & Coke Company eight or ten years before, although that fact was not shown to be within Ison's knowledge, and he denied knowing it.

This is the substance of all the testimony upon which Sanders rests his case for a reformation of the deed.

On the other hand, appellant, Sam T. Ison, says he and Sanders went over the land together, talked over the trade one day, and closed it the next morning; that Sanders told him he owned the land and mineral and the small timber; that there were a number of trees on the

place which had been branded and sold; that he did not own the timber branded "J. O."; that Sanders represented that he owned the fee simple in the land except the timber; that he believed he was getting the mineral with the surface when he made the trade; that he would not have made the trade if he had not thought he was getting the mineral rights; that he made inquiries of Sanders concerning the coal and mineral upon the land, and that Sanders showed him a coal bank, while he was talking about buying the land.

Ison further contradicts the statement of Sanders as to what he said concerning the reading and acknowledgment of the deed.

Ison places the value of the surface of the land after excluding the mineral rights at from $1,000.00 to $1,500.00; and with the mineral rights at from $5,500.00 to $6,500.00.

Upon cross-examination Ison testified as follows:

"Q. Where were you when J. M. Sanders told you he owned the coal rights on this land? A. Well, we were down in the bottom looking over the level land first, and then we went up the branch and looked over the cleared land. Q. What was it he said—give his exact words about the coal and mineral? A. We went out looking over the place, and I asked him what had been sold on the farm, and he said the large timber trees has been sold; I don't remember exactly the number of trees, and he said he had a record of it, but he says the mineral and small timber still belong to me. I asked him in regard to the railroad right-of-way, as to whether any railroad right-of-way had been sold, and he said there had not."

John Moore, a witness for Ison, testified as follows, concerning a conversation between Sanders and Bentley:

"Q. Did you ever have any conversations with him and Mr. LaFayette Bentley with reference to the land Mr. Ison bought of Mr. Sanders? A. Yes; I come along with him and had a talk about it. Q. Was Mr. Bentley talking about buying the same land that Mr. Sanders afterwards sold to Mr. Ison? A. Yes, sir. Q. What was said between them. A. We all come down to his home and then went on down to the mouth of the branch and across on the railroad, and I believe the first thing they said was something about $5,000.00, and then he asked him if the timber was sold, and Sanders said it was sold;

and then he asked him if the mineral was on it, and I believe he said it was on one tract, and sold on the other tract.''

Concerning the same conversation, Bentley testified as follows:

''Q. Are you acquainted with the land in controversy in this action? A. I know where it is. Q. Did you ever undertake to purchase the land owned there bv J. M. Sanders, and was there ever any connections between you in regard to the land? A. Yes, sir; he tried to sell it to me, and I asked him if the mineral was sold, and he said a part of it was sold. Q. Where was that conversation? A. At the mouth of Beefhide Creek. Q. How long was it before he sold the land to Mr. Ison? A. Something over a year.''

Muncey Ison, a brother of the appellant, and a cousin to Sanders, testified as follows:

''Q. How long have you been acquainted with Mr. Sanders, if you know? A. All of my life, I reckon. Q. Do you recollect the time he sold the farm up here on Beefhide Creek to your brother, the defendant? A. Yes, sir. Q. You may state whether or not you had any conversation with him in regard to this land? A. Yes, sir; I was there one day and he asked me if Sam ever bought a farm, and I told him he had not, and he said tell him to come over and I will sell him the farm right. Q. Tell all he said in that conversation? A. He said he had sold the big timber, and he had the coal and the small timber yet. Q. Did you tell your brother, Sam T. Ison, what he said in regard to this land. A. Yes, sir. Q. How long afterwards? A. A few days; I don't know exactly. Q. Did Sam come to see the land? A. Yes, sir; he come the same day. Q. Where were you when he told you this? A. I was at his house. Q. Do you remember whether or not anybody was present? A. No, sir. Q. If I understand you, you say he told you the big timber had been sold, and that he still owned the coal and the small timber? A. Yes, sir.''

The value of the surface, after excluding the mineral rights, is fixed by the several witnesses, excluding appellant, at from $3,000.00 to $6,000.00; and with the mineral rights at from $10,000.00 to $15,000.00.

Appellant testified that Sanders had listed the land for taxation at $1,500.00 in one year, and at $2,000.00 in another year; and in this he was not contradicted.

These facts respecting the value of the land are to be considered only as circumstances bearing upon the issue of mistake.

Applying the legal principles above announced to these facts, we must deny Sanders' prayer for a reformation of his deed.

There is no fraud charged against Ison, or shown; there was no mistake upon his part; and Sanders is contradicted upon every material question of fact. His proof does not reach that degree that is required to warrant the reformation of an executed contract, under the rule above stated.

Appellee rests his claim to an affirmance upon Sanders v. Rowe, 20 Ky. L. R., 1082, 48 S. W., 1083. That case is not, however, controlling here.

2. Are the Isons entitled to a rescission of the contract of sale?

In the absence of fraud, insolvency or non-residence of the vendor, a vendee in peaceable possession of the granted premises under a deed containing a covenant of general warranty is not entitled to a recission of the contract when sued for the purchase money, although the vendor may have represented his title as perfect, when in fact it was not. In such a case the vendee must pay the purchase money and rely upon the covenant of warranty in case of an eviction. Simpson v. Hawkins, 1 Dana, 303; English v. Thomasson, 82 Ky., 283.

But, Sanders being insolvent, and the deed standing as drawn, the Isons are, under the same rule, entitled to present relief by way of rescission, if a case for rescission be made out. Laevison v. Baird, 91 Ky., 204; Little v. Bishop, 22 Ky. L. R., 1748; Coleman v. Ill. Life Ins. Co., 25 Ky. L. R., 902.

In enforcing the equitable right of rescission a court of chancery will, as the necessities of the case require, afford relief either by directing a reconveyance, or simply by ordering the instrument to be surrendered for cancellation. This relief is based upon equities which arise out of fraud and mistake. Bispham's Equity, Sec. 472.

In Jopling v. Dooley, 1 Yerg., 289, 24 Am. Dec., 450, it was held that where the defect in the land or title was fraudulently concealed by the vendor, the vendee might either have the whole contract set aside, or have compensation for the defect; and in York v. Gregg, 9 Tex., 85, where the vendor could not give title to a part which

formed the principal inducement to the purchase, it was held the contract should be rescinded altogether, and not enforced with a ratable deduction of the purchase money.

See also Bailey v. James, 11 Gratt., 486, 62 Am. Dec., 659.

In 6 Cyc., 341, it is said:

"Cancellation of the purchase money notes which are outstanding, or injunction against their collection, unless they have passed into the hands of a *bona fide* holder in the course of trade, as well as recovery of the portion of the purchase money already paid, is proper relief to be awarded on a decree for rescission at the suit of the vendee."

And, while we recognize the rule requiring the charge of fraud or misrepresentation to be satisfactorily established by the proof, we think the facts of this case bring it within the rule.

The scope of the deed by which Mullins conveyed the mineral and timber rights to the Northern Coal & Coke Company was so broad and far-reaching as to very materially affect the use of the surface for farming or other purposes. This fact, taken in connection with the express statements of Sam Ison, John Moore, Bentley, and Muncey Ison, that Sanders said he owned the mineral rights before he sold the land to appellants, strongly supports appellants' charge of fraud and misrepresentation upon the part of Sanders as to his ownership of the mineral rights.

According to Muncey Ison's testimony, Sanders directed him to tell Sam Ison to come over and he would sell him the farm; that he had sold the big timber, but that he still retained and owned the coal and the small timber.

This testimony is not, under the circumstances, to be outweighed by the testimony of Sanders' two young children and of Moore, the clerk, to the effect that something was said about a mineral deed at the time the deed to Ison for the land in question was acknowledged by Sanders and wife. That proof, at best, is of an uncertain meaning and application.

Under all the proof, we are of opinion appellants have sustained their claim of misrepresentation, and that appellants are, therefore, entitled to a rescission of the contract, including the cancellation of the unpaid

purchase money notes. This relief should be adjudged to them, however, upon equitable principles.

As a condition to it, appellants must restore appellee, as far as possible, to the position which he occupied before the transaction. This would require them to reconvey the land and account for its use and occupation from the time they received possession thereof, and for any waste committed by them.

On the other hand, the appellants will be entitled to the return of the purchase money they have paid, with interest from the time of payment, and any taxes paid or improvements put upon the land by them to the extent that they have increased the vendible value of the land; and to the extent that these credits exceed the charges against appellants, they will be entitled to a lien upon the land in question. Bibb v. Prather, 1 Bibb, 313.

The judgment is reversed, and the action is remanded for further proceedings consistent with this opinion.