## Robinson, et al. v. Eastern Gulf Oil Company, et al.

(Decided May 12, 1922.)

### Appeal from Lee Circuit Court.

1. Deeds—Ambiguity.—A deed which contains a granting clause in the form of an absolute conveyance of one-half of the fee, except the coal, and which also contains the words "we release all purchase money liens we have on all land J. S. Robinson sold to John Barnett on Cave's Fork, Lee county, Kentucky," is ambiguous on its face.

2.  Reformation of Instruments—Ambiguity—Intention of Parties.—In the absence of fraud an ambiguous instrument will not be reformed to conform to the intention of the parties to it unless the proof as to its intent and purpose is full, clear and convincing, and this includes proof of mutual mistake in its execution.

3.  Reformation of Instruments—Ambiguity—Intention of Parties.— Reformation of an ambiguous writing is not authorized, unless after careful consideration of all of the evidence and relevant circumstances connected with the transaction, the logical conclusion is that the instrument does not express what was the obvious intention of the parties in executing it.

4.  Deeds—Intention of Parties.—The facts and circumstances leading to and attending the execution of the writing in controversy examined, and held to show that it was the intention of the parties to it to effect the release of a lien on the land described and not to convey any part of the minerals in it.

5.  Evidence—Declaration of One Since Dead.—Testimony of parties to the litigation detailing conversations with a party to the paper in dispute who has since died, is incompetent, and conversations between the parties and their attorneys, not held in the presence of the opposing parties, is likewise incompetent, under section 606 of the Civil Code.

6.  Evidence—Declarations of One Since Dead.—Declarations of a party to the writing in dispute, not made in the presence of his adversary, are inadmissible as self-serving statements, and the rule is not different where the declarations were made by one who has since died.

7.  Evidence—Statements Against Interest.—Statements against interest made by a party to the writing in controversy are competent as against those claiming under him in this litigation.

RYLAND C. MUSICK, PENDLETON & BUSH, CHAS. F. SPENCER, STOLL & TOWNSEND, HAZELRIGG & HAZELRIGG, J. P. HOBSON & SON, C. C. TURNER and DILLARD H. TURNER for appellants.

ROBT. H. WINN, JOHN A. JUDY, ED. C. O'REAR, S. H. HURST, CARTER STAMPER, D. B. ROSE, GEO. W. PENDERGRASS and J. K. ROBERTS for appellees.

OPINION OF THE COURT BY JUDGE MOORMAN—Affirming.

The former appeal of this case was disposed of in Eastern Gulf Oil Company, etc. v. Lovelace, etc., 188 Ky. 238. The judgment was reversed and the cause remanded to the Lee circuit court for trial on the equity side of the docket. In the opinion the court said:

"From a reading of the authorities, *supra*, we are convinced that the defendants in this case are entitled to have the writing of May 6, 1909, reformed so as to ex-

press the true intention of the parties in executing it, if, upon proof heard, it fails to do so. . . . We refrain from expressing an opinion as to the effect of the paper in controversy if construed upon its face only, since its language affords room for two different and distinct constructions. If there existed no other equitable consideration for the admission of extraneous proof to show the intent and purpose of the parties in executing it, the ambiguity appearing upon its face would afford such grounds.''

On the second trial in the circuit court the only issue was whether the paper in controversy did or did not express the true intention of the parties in executing it. The chancellor at that hearing held that it was intended as a release of a lien on the land described, and, accordingly, adjudged a reformation of it to conform to the intention of the parties in executing it.

It is shown in the proof that the Millers Creek Lumber Company in 1905 acquired a tract of land of more than 2,000 acres in Lee county, several miles from Beattyville; that its purpose in acquiring the land was to market the timber on it, and that it employed John S. Robinson and W. B. Chester to assist in the cutting and removing of the timber; that by the latter part of 1907 practically all of the merchantable timber had been removed and on January 4, 1908, the lumber company sold about 2,000 acres of the land, including all of its original purchase, except a tract of 148 acres which it had previously sold to Malin Jones, to John S. Robinson, for $3,000.00. Of this amount $1,800 was paid in cash, and for the balance John S. Robinson executed his promissory notes to secure which a lien on the land was retained by the Millers Creek Lumber Company. In making the conveyance the lumber company reserved one-half of all minerals in and under the land.

It also appears in the record that before purchasing the 2,000 acre tract, John S. Robinson had negotiated with different persons for the sale of various parts of it; that on January 20, 1908, he conveyed to George S. Barnett 100 acres on Cave's fork (the land in dispute), reserving in the deed all minerals in and under the land. The deed recited that Robinson derived title from the Millers Creek Lumber Company, under deed of date January 4, 1908. All of the timber on the 2,000 acre tract had not been removed when the conveyance of January 4, 1908, was made and the right of entry for the pur-

pose of removing it was reserved by the grantor in that deed. On December 7, 1910, after all marketable timber had been removed, the Millers Creek Lumber Company, in order to perfect the title in John S. Robinson, conveyed to him the timber then on the land, and in that instrument reiterated its reserved right to one-half of the coal and other minerals in and under the land. Robinson made conveyances of different parts of the land, beginning January 20, 1908, and, finally, by deed of December 8, 1910, to D. B. Pendergrass, disposed of his remaining interest, under the deeds of January 4, 1908, and December 7, 1910, including all his mineral rights. In the previous conveyances mentioned he in some instances excepted or reserved all the minerals, in others one-half of them, in others one-half of the coal, and in others he made no exceptions or reservations whatever.

The tract of 100 acres on Cave's fork, conveyed by Robinson to Barnett on January 20, 1908, was sold by Barnett to Jack Spicer and conveyed to the latter's wife, Maggie Spicer, May 17, 1909, the coal being reserved. However, none of the mineral rights passed under the deed, for Barnett had acquired none in his deed from Robinson. At that time there was a purchase money lien in favor of Robinson on the 100 acre tract for $175.00. There was also a lien for $1,200.00 on the entire tract of 2,000 acres in favor of the Millers Creek Lumber Company under the deed of January 4, 1908. The evidence shows that Spicer, learning of the lien of the Millers Creek Lumber Company, refused to consummate the purchase until that lien was released and also required a release of the lien in favor of John S. Robinson. It appears that Robinson, Spicer and Barnett went to the office of the county court clerk in Beattyville to arrange for the release of those liens, and while there the writing of May 6, 1909, was prepared by G. W. Pendergrass, a deputy clerk in his father's office, with the assistance and suggestions of John S. Robinson.

The appellants, heirs of John S. Robinson and their lessees, claim that the writing of May 6, 1909, was intended as a conveyance of one-half of the minerals, except the coal, in the 100 acre tract. They admit that before his death, Robinson had disposed of the interest that he acquired in the 2,000 acre tract, under the deeds from the Millers Creek Lumber Company of January 4, 1908, and December 7, 1910. But they say that while employed by that company in cutting the timber from the

2,000 acre tract, he discovered a mineral deposit on Cave's fork within the boundary of the 100 acres and conceived the idea that it was very valuable and with that in mind purchased the 100 acres before acquiring title to the 2,000 acre tract, or at any rate purchased it independently of the larger tract, believing that it would make him and his heirs rich, and that the writing of May 6, 1909, was executed to effectuate that purchase.

For appellees it is contended that the intent and purpose of the writing of May 6, 1909, was to release the lien on the 100 acre tract included in the boundary of the 2,000 acres, which existed by reason of the unpaid purchase notes of $1,200.00; and that Pendergrass, who prepared the writing, was young and inexperienced, did not know how to write a deed of release and thus failed to express in the instrument the true intent and meaning of the parties to it.

The recited consideration in the writing of May 6, 1909, is $175.00 cash in hand paid. The granting clause is in the form of an absolute conveyance of one-half of the fee, except the coal. Immediately preceding the signature "Millers Creek Lumber Company, by J. Will Clay, president," are the following words written with pen and ink: "We release all purchase money liens we have on all the land J. S. Robinson sold to John Barnett on Cave's fork, Lee county, Kentucky." Were it not for these words there could be no question that the writing is an absolute deed of conveyance. But the words written with pen and ink following the typewritten words render the instrument ambiguous on its face as was held on the former appeal of this case.

In the absence of fraud the general rule is that the reformation of a written instrument to conform to the intention of the parties to it will not be decreed unless the proof as to its intent and purpose is full, clear and convincing. This necessarily includes the showing of a mutual mistake in its execution. There is a full discussion of the subject in Ison, et al. v. Sanders, 163 Ky. 605, with the citation of numerous decisions of this court and others supporting the doctrine. In its practical application the meaning of the rule is that reformation will not be granted unless after careful consideration of all the evidence and relevant circumstances connected with the transaction, the logical conclusion is that the instrument does not express what was the obvious intention of the parties in executing it. With this in mind we are

compelled to look to the relationship of the parties and their situation at the time the instrument of May 6, 1909, was executed, to the circumstances leading to its execution and delivery, and to the language of the writing itself with the view of ascertaining what was intended to be accomplished by its execution. ·

Elaborate and able discussions of the two theories advanced have brought to the attention of the court every detail that seems pertinent to the question at issue. It is, however, not possible in this opinion to discuss every feature of the evidence regarded by counsel on either side as substantially affecting the proper determination of the case. Proof of the intention of the parties to the paper is necessarily somewhat circumscribed owing to the fact that John S. Robinson is now dead. But there are undisputed facts in evidence that, in our opinion, clearly elucidate their intention, and to these and the main contentions of the parties we must confine this opinion.

It is said that John S. Robinson was a good business man and knew the difference between a deed of release and an absolute deed. Upon that hypothesis it is earnestly argued for appellants that to construe the writing of May 6, 1909, as only a release of the lien of $1,200.00 on the 100 acre tract would be wholly illogical, in view of the fact that it purports in the typewritten part of it to convey a "one-half undivided interest in" the described land. In directing attention to the fact that the quoted words were interlined in type, it is suggested that if Robinson had been seeking a release of the lien he would certainly not have interlined those words, as he would have desired a release of the entire tract and not one-half of it. The premise being admitted there is much force in the suggestion, for the interlineation indicates that the instrument was not intended to be a release; and standing alone or with less convincing evidence to oppose it the circumstance would be controlling. But, with respect to the truth of the theory that Robinson understood how different kinds of deeds should be prepared, it might be observed that, if appellants' contention is sound, it would seem that he would have required Pendergrass to write the one in controversy so as to convey the one-half undivided interest of the Millers Creek Lumber Company in the minerals, and would not have required it to be so framed as to convey in addition one-half of the surface, which theretofore had been conveyed in the deed of Jan-

uary 4, 1908. While it is true that the conveyance of one-half of the fee would have resulted in a transfer of the mineral rights of the lumber company to Robinson, nevertheless, the failure to limit the estate to that owned by the grantor and, as appellants contend, to that actually desired by Robinson, is some evidence of the draftsman's unfamiliarity with deeds of different kinds. This, as well as Robinson's manner of dealing with the minerals in conveying other parts of the larger tract, leads to serious doubt as to his ability clearly to express his intention in instruments of this kind. We are, therefore, unable to say that the circumstance of the interlineation, strong as it is, is of sufficient import to rebut other undisputed facts and circumstances that show the writing was intended as a release and nothing more.

The reservation of one-half the coal in the paper of May 6th is pointed to as an indication that it was the intention of Robinson to acquire all other mineral rights of the lumber company. The deduction might be drawn, were it not for the fact that in deeds which he made to parts of the 2,000 acre tract, in some instances he reserved all minerals, in others one-half and others one-half of the coal, while in others no reservations were made, although he never owned more than one-half of the minerals in that tract. It is conceivable from an inspection of those deeds that he used the words "coal" and "minerals" synonymously. From that point of view the reservation lends itself to the theory that he intended the instrument to be merely a release and not a conveyance of title to one-half of the fee. It is certainly as susceptible of the one construction as the other, when considered in the light of other conveyances made by him.

Without contradiction the testimony shows that Robinson, Spicer and Barnett went to the office of the county court clerk of Lee county for the purpose of effecting the transfer of the 100 acre tract to Maggie Spicer; that Robinson held a lien on it for $175.00 under the deed of January 20, 1908, and that the Millers Creek Lumber Company under the deed of January 4, 1908, held a lien of $1,-200.00 on the 2,000 acre tract in which it was included; that Spicer would not consummate the deal with Barnett until the liens were released. The fact that the three together went to the clerk's office for the purpose of making the transfer from Barnett to Spicer and of releasing the liens on the land is, in our opinion, an important circum-

stance tending to show the purpose of the instrument of May 6, 1909. Furthermore, it is a significant fact that the recited consideration in that instrument was the same as the amount of Robinson's lien against the land which Spicer agreed to and did pay. That the $175.00 was never credited on the $1,200.00 lien note is a circumstance indicating that the 100 acre tract was purchased outright, but it does not outweigh other material facts tending to establish a contrary view, and is explainable on the theory that Robinson was then living at Williamsburg, to which place he returned before the transactions were closed, and the office of the Miller's Creek Lumber Company was at Mt. Sterling; and while Robinson may have promised to apply the $175.00 to the $1,200.00 lien, it may easily be seen in the circumstances how he failed to do so and how that failure escaped the attention of the Millers Creek Lumber Company and his promise in that respect was not insisted upon by that company.

Pendergrass, who prepared the writing of May 6, 1909, also prepared the power of attorney authorizing the release of the lien held by Robinson. The power of attorney was prepared in excellent form. That fact is said to disprove Pendergrass' statement that the paper of May 6th was intended as a deed of release and was not so drawn because of ignorance or lack of experience on his part. Its tendency in that direction is unquestionable. But the inquiry naturally arises, why bring Barnett and Spicer to the clerk's office for the preparation of that paper, if it was to be a conveyance of one-half of the minerals, as claimed by appellants, and why have it prepared at that time? If it was not to be a deed of release Barnett and Spicer had no interest in it, and if it was not intended as a deed of release then Robinson was not doing what Spicer demanded that he do and what the two with Barnett came to the clerk's office to do.

There is additional corroboration of Pendergrass in the fact that the power of attorney, though made and delivered on May 7, 1909, was not executed by Pendergrass until seven days later. If, as contended by appellants, Robinson was seeking by the instrument of May 6th, to acquire the undivided half interest of the Millers Creek Lumber Company in the minerals, and not a release of its lien on the 100 acre tract, why did he not release his lien while there in the clerk's office and why give Pendergrass a power of attorney at all or defer the releasing of his lien until he acquired a one-half interest in the minerals

with which neither Spicer nor Barnett was concerned? These inquiries are not answered by saying that Robinson wrote Clay, at the time of or immediately after sending the paper, requesting the release of the lien on the 7 acre tract sold to Barnett, and that the words "we release all purchase money liens we have on all land J. S. Robinson sold to John Barnett on Cave's fork, Lee county, Kentucky," were added to comply with that request. This theory of appellants is at best conjectural. It is without evidential support and does not comport with what might reasonably have been expected of Robinson from that point of view; besides, it is wholly incompatible with any reason for his accompanying Barnett and Spicer to the clerk's office to arrange for the release of the liens on the 100 acre tract. The words were written by the Millers Creek Lumber Company, except for which the $1,200.00 lien would not have been released. But that they were added to the paper by an officer of the lumber company in order to comply with the request of Robinson is nothing more than a surmise, the effect of which denies the established fact that Robinson went to the clerk's office with Barnett and Spicer on the day the paper in dispute was prepared to arrange to clear the title to the 100 acre tract so that it could be transferred to Spicer. If appellants' theory be correct, Robinson did nothing, while at the clerk's office, to effectuate the purpose for which he is shown to have gone, unless it be that he left with Pendergrass a power of attorney to release the lien held by him. That instrument bears the date of May 7th. Its existence can be accounted for on no other ground than that Robinson did not personally release his lien because Spicer, as the evidence shows, would not take the land unless the $1,200.00 lien was also released; and with the view of releasing both, the two papers were prepared, that of May 6th to effectuate the release of the larger lien and the power of attorney of May 7th, which on returning to Williamsburg, Robinson left with Pendergrass to be used, in the event of the execution and return of the paper of May 6th. These inferences seem to us irresistible. That they should not prevail against positive evidence to the contrary may be conceded, but there is no such evidence in this record. As we view the evidence as a whole, including that of G. W. and D. B. Pendergrass, which we see no reason to doubt, and see the purpose of Robinson as manifested by his conduct and revealed in the circumstances connected with the paper of May 6th,

there is but one conclusion to reach, that is, he intended by that writing to procure the release of the $1,200.00 lien in order to give Spicer what he demanded, a clear title to the 100 acres he was buying.

An incident that throws considerable light on the contention of the parties is that in 1917, after the discovery of oil on this land, and perhaps after several profitable wells had been drilled on it, the writing of May 6, 1909, was found in the possession of Spicer. If that writing, as originally prepared, was intended as a conveyance of an undivided half of the minerals in the land it is not probable that it would have been delivered to Spicer and retained by him until 1917; certainly Robinson, who is said to have been extremely anxious to acquire title to the minerals and who, as contended, had the writing prepared with that end in view, would have seen to it that the paper came into his possession for safekeeping. The failure of Robinson to have the writing returned to him and to keep it, can not be attributed to the fact that it was also a release of the $1,200.00 lien, for the words giving it that effect were added at Mt. Sterling, apparently, without the knowledge of Robinson, Spicer and Barnett. But notwithstanding the added words, the primary purpose of the writing, if appellants' contention be true, was to convey one-half of the minerals to Robinson, and he was manifestly entitled to the possession of the instrument originally prepared for his benefit and intended for him. Its delivery to Spicer and his retention of it until 1917, without objection from Robinson or any of the appellants in this case, indicate that Robinson considered it a deed of release, to the possession of which Spicer was entitled.

The power of attorney to Pendergrass was made about the time the paper in controversy was prepared. Evidently the release of the lien held by Robinson depended upon the happening of some other event, otherwise he would have released it in person while in the clerk's office. The writing of May 6th was acknowledged at Mt. Sterling, May 10th, returned to Beattyville and put to record May 18th. Robinson's lien was released on the same day, and the deed to Spicer was recorded the following day. These coincidents can not be regarded as insignificant. They indicate a definite plan to the consummation of which the execution and return of the paper of May 6th was essential. Other events awaited the return of the paper, before it was known that

it had been changed, events that related solely to the sale of the 100 acre tract to Spicer and the clearing of the title to it, neither of which could be done until the $1,200.00 lien was released, for which no provision was made at the meeting at the clerk's office unless the paper of May 6th so provided. The inference is unmistakable; it is that Robinson and the other interested parties believed the writing to be a release and nothing more.

The conclusion just stated is strongly supported by the testimony of G. W. Pendergrass and his father. It is also fortified by the inference to be drawn from the deed of December 7, 1910, wherein there was an express recognition on the part of Robinson of the right of the Millers Creek Lumber Company to one-half of all coal and other minerals in and under the original tract, including the 100 acres involved in this suit. That deed, as was held on the former appeal, does not operate in estoppel against these appellants; but it discovers Robinson's attitude at the time and to that extent shows the intended meaning of the writing in controversy here. If Robinson then believed that under the instrument of May 6th, he had acquired the minerals in dispute, and if he, as contended by appellants, believed those minerals to be highly valuable, it is hardly possible, and certainly not probable, that nearly two years later he would have accepted a deed disavowing his claim.

We are unable to believe that Robinson intended the writing of May 6th to be anything more than a release of the lien held by the Millers Creek Lumber Company. That he considered the land of great potential value and purchased it separately from the larger tract amounts to little more than a supposition when the incompetent testimony relative to that feature of the case is excluded. The evidence of Spicer and Jones is indefinite; it is contradicted by reliable circumstances and is opposed by the evidence of Chester, who was a partner of Robnison and participated in the negotiations for the larger tract until Robinson finally concluded to purchase it.

The testimony of the Clays detailing conversations and transactions with Robinson is incompetent, and the testimony of R. H. Winn relative to his conversations with Matt Clay is likewise inadmissible, under section 606 of the Civil Code. Appellants introduced witnesses who stated that they heard John S. Robinson in the later years of his life say that he owned one-half of the minerals in the tract of land on Cave's fork. It is argued

that the testimony is competent as tending to show Robinson's state of mind and his understanding of the paper in dispute. There is authority to support the contention. (Cannon v. Baker, 97 S. C. 116; Bell v. Pleasant, 145 Cal. 410, 104 Am. St. R. 61; Copper v. Bower, 78 Kan. 156; 1 R. C. L. 491, and 16 Cyc. 1183.) The rule, however, has never been adopted in this state and to apply it in this case would be an unwarranted innovation. The declarations of one in possession of personal property, showing the manner in which it is held, are admissible. (Morgan, et al. v. Williams, 179 Ky. 428.) But generally self-serving statements are held inadmissible and in this jurisdiction the rule is not different where the statements were made by one who has since died. (N. Y. Life Ins. Co. v. Johnson's Admr., 24 Ky. L. R. 1867; Jackson Baptist Church v. Combs' Exr., 130 Ky. 255; Ware v. Bennett, 143 Ky. 743.) Robinson was not in possession of these minerals and if alive he would not be permitted to prove self-serving statements, not made in the presence of his adversaries. We are unable to see any reason why the rule should be different since he is dead. Declarations against interest would be competent were he living and upon the same principle are competent against appellants who are claiming under him.

But if the testimony to the effect that Robinson claimed to own an interest in the minerals be accepted and considered, the conclusion we have reached would not be changed. The witnesses who so testified are not shown to have been intimately associated with Robinson. The statements were made several years ago and as reported by the witnesses were more or less indefinite, all of which necessarily affects the credibility of the testimony; besides there are undisputed facts of convincing force and effect to the contrary, which as we view the case are decisive of it.

Looking to the situation of the parties at the time the paper in controversy was executed, the circumstances attending its execution and their subsequent treatment of it, we can not escape the conclusion that its sole purpose was to effect a release of the $1,200.00 lien on the 100 acre tract in controversy. This was the view of the trial court and, in our opinion, it is sound. The judgment is, therefore, affirmed.

Whole court sitting.