## Camp v. Kimbley, et ux.

(Decided June 4, 1920.)

## Appeal from Ohio Circuit Court.

1. Deeds—Validity.—A deed valid on its face will be sustained in the absence of evidence of such fraud, deceit, misrepresentation or other circumstances justifying the court in cancelling the same.

2. Contracts—Fraud or Misrepresentation—Evidence.—To justify a court in setting aside a contract formally entered into by the parties the evidence of fraud in its procurement by either party should be clearly established.

3. Contracts—Fraud or Misrepresentation.—Courts will not lightly set aside a contract in the absence of convincing evidence of fraud or misrepresentation.

4. Contracts—Fraud or Misrepresentation—Burden of Proof.—The burden of proving fraud or misrepresentation in a suit to set aside an executed contract is generally upon the party aggrieved.

5. Deeds—Fraud or Misrepresentation—Mines and Minerals.—Where the grantor in a deed conveying coal lands is as well posted as the grantee regarding the price of said properties and he was not overreached in any way and no fraud, deceit or misrepresentation is shown, the deed will be sustained. The fact that the price of coal advanced shortly after the execution of the deed or that the grantee succeeded in driving an entry under a hollow, a doubtful proposition at the time, are not grounds for setting aside the deed.

SELDEN Y. TRIMBLE, TRIMBLE & BELL, ERNEST WOODWARD and A. D. KIRK for appellants.

BARNES & SMITH and J. S. GLENN for appellees.

OPINION OF THE COURT BY JUDGE QUIN—Reversing.

C. G. Kimbley and others on December 30, 1910, executed to W. S. Thompson a lease for a period of twenty-five years, on 219½ acres of coal lands made up of two tracts, one of 148 acres, the other 71½ acres, the consideration being $3,000.00 and a royalty of 2c per ton on mine run coal. The lease covered only the No. 11 coal under the premises. The right to the surface of eight additional acres was given, with the privilege to purchase the fee in said eight acres for the sum of $100.00 per acre any time during the life of the lease.

The right was given to use the properties for such purposes as might be necessary in the operation of the

mine, among other things the right to construct and maintain the necessary entries, exits, air shafts, ventilation shafts or courses upon any part of the 219½ acres.

Thompson assigned this lease to the Kimbley Coal Company, a corporation organized by ten men, most of whom lived in the nearby counties.

November 15, 1911, the Kimbleys leased to the coal company for a consideration of $55.25 a tract of 2 21/100 acres for a period of twenty-five years, with the right to purchase the surface of said tract at any time during said twenty-five years for $75.00 per acre. The stockholders in the coal company, with possibly one exception, knew little or nothing about the mining of coal. For several years prior to its purchase by the company Kimbley, had operated it, in a small way, as a hand pick mine. The company installed modern machinery and equipment. It operated the mine during the years of 1911, 1912 and 1913, but the operation resulted in a loss to the company of something over $40,000.00.

One of the stockholders, with an associate, undertook the operation of the mine during 1914 and 1915. The company received nothing from this venture, which resulted in a loss to the operators of something in the neighborhood of $2,000.00. The market for western Kentucky coal was not very promising at this time. It cost more to mine coal than it would bring on the market. Under these circumstances no further effort was made on the part of the company to operate the mine, other than securing one car to be sent as a sample to prospective purchasers, a sale from which did not materialize.

For some years prior to 1916 many operators in western Kentucky lost money and the coal business was extremely dull during this period. In the late summer of 1916 and the fall of said year conditions improved somewhat, but coal men did not have much confidence in the improvement. There was no upward trend in this coal market until about November, 1916. Convinced that the coal company could not operate the mine at a profit the several stockholders made individual efforts to dispose of the mine. There seems to have been no concerted action about the matter. But few meetings of the stockholders were held during the life of the corporation.

Interested persons made many trips to different states hoping to find a purchaser for the mine. It was at one time thought there was a good prospect to exchange the mine for some Arkansas property, but this deal, like so many others, failed. The stockholders lost courage and despaired of ever disposing of the mine. While it operated the mine the company paid the lessor the royalty due under the lease. Kimbley says he received something over $500.00 on this account.

In October, 1916, Dickinson and Camp, two of the stockholders, went to Kimbley's home for the purpose of endeavoring to get him to execute a deed to them for the No. 11 coal. This visit was on October 9th; pursuant to an agreement entered on that date a deed dated October 10th, was made by Kimbley and wife to Camp, by the terms of which they conveyed to the latter all of the No. 11 coal under the 219½ acres, and the fee simple title to the two tracts of eight and two and 21/100 acres respectively. The consideration was $1,000.00, $500.00 of which was paid at the time of the execution of the deed, the remaining $500.00 to be paid when the property was conveyed as a whole. This deed was drawn by Mr. Trimble, the president of the company, at his office in Hokpinsville on October 11th; he wrote the deed himself, at night, after his stenographer had gone home; the deed as it now appears (erroneously dated October 10th) is the same as written by him that night, with the exception that a cover was later placed on it. There have been no alterations, erasures, additions or changes of any kind in said deed. He copied the descriptions and certain other phraseology incorporated in said deed from other papers pertaining to the Kimbley property which he had in his office at the time.

Appellee, Kimbley, lived on the premises; his home was located about 500 yards from the mine opening; he saw different persons who visited the mine, among others a Mr. Randle, who later became interested in the mine as will presently be seen.

The deed from Kimbley to Camp was acknowledged October 12, 1916, but was not recorded until December 24, 1917. It was delivered to Kimbley by Mr. Dickinson and his brother; Camp did not return to the Kimbley home with the deed because of an engagement with a friend to go to Madisonville the next day and purchase some cattle.

Unknown to the Dickinsons and Camp (according to their testimony), E. J. Ware, treasurer of the company, and Vernon Camp a stockholder in the company, and a brother of appellant, on October 12, the day the deed was acknowledged, met the Messrs. Randle in Madisonville to consummate a deal for the mine. The Randles had been in correspondence with Ware since the spring or early summer of 1916. They had met on previous occasions at Nashville and Central City to discuss the matter. As the result of their conferences on October 12th, a lease was executed on that day by the coal company to the Messrs. Randle by the terms of which the Messrs. Randle acquired for a period of three years, all of the company's interest in and to said mine and equipment, including the right to the No. 11 coal under the 227 acres, more or less, it being provided in said lease that the Randles were to pay a royalty of 6c per ton on all the coal mined, of which 2c was to be paid Kimbley. The Messrs. Randle took charge of the mine pursuant to said lease and paid to Camp the royalties according to the terms thereof. Camp having secured from Kimbley the deed of October 10, conveying to him the No. 11 coal, retained the royalty which would otherwise have gone to Kimbley.

Subsequent to the execution of the lease, to-wit, about August 1, 1917, the Randles acquired, by purchase, the stock in the coal company for the consideration of $35,000.00.

On June 30, 1917, appellees instituted this suit seeking to set aside the deed executed by them to Camp on October 10, 1916, on the ground of alleged false and fraudulent representation by which appellees, for a grossly inadequate consideration, were induced to execute the deed aforesaid. This contention was sustained by the lower court. Said deed was cancelled, set aside and held for naught. It was also adjudged that Kimbley recover of Camp approximately $600.00, to be credited by the amount that had been previously paid Kimbley on account of the deed.

As grounds for setting aside the deed it is said that appellees were unacquainted with the value of the coal properties; that Kimbley and his wife were old and infirm and that a spell of fever had left him in a weak physical and mental condition; that he could be easily persuaded and influenced; that Camp and Dickinson repre-

sented to him they were acting for the company and not for themselves, concealing from Kimbley the fact that the increasing demand for coal had materially advanced the price of this product, and further concealing from him the fact that the company had already substantially agreed upon the lease with the Messrs. Randle, which was consummated on the day he executed the deed. That they further falsely represented to him the company had found out by an examination of the mines and its entries that the coal owned by appellee across the hollow from the mine opening could not be worked from the entries in said mine and no entry could be driven across the hollow to get said coal; that the company could not sell its holdings without owning the royalty and the surface of the land upon which the improvements were located; that appellees' property was worthless except it be sold as a whole, and their only chance to realize anything out of the lease was to transfer it and the surface on which the improvements were located to them (Camp and Dickinson) for the company, for the recited consideration, all of which directly affected the operation of the mine and its continued operation upon which the payment of appellees' royalty depended, as their lease did not provide for the payment of any minimum royalty. That representatives of the company informed Kimbley the company would not operate or lease the mine and did not advise him the company was on the point of perfecting or had perfected the execution of a valuable contract or lease with Randle.

On the main issues the testimony in behalf of appellees was given by Kimbley himself and his daughter, and they were contradicted in practically every essential detail by one or more witnesses for appellant.

The events leading up to October 12, 1916, are wholly different accordingly as depicted and interpreted by the parties. Very divergent are their views, as may be expected. Prospectively the situation does not appear the same as when seen in retrospect. The increased price of coal is attributable to the war and various other causes arising subsequent to the date of the deed. Looking at the bargain made by appellees as of the present date, if the deed is upheld, the consideration of $1,000.00 is insignificant as compared with what they would have received had they not entered into this contract, but this fact is not of itself sufficient to authorize a court of

equity in setting aside a deed. If the coal market had remained the same it is hardly probable this suit would have been thought of. It was undoubtedly the enhanced value of coal and Randles' successful operation that suggested the suit.

We must look at the situation of the parties as it existed at the time, such for example as the dullness of the coal market; the loss sustained by the stockholders in the company; their inability after repeated efforts, to interest capital; the debatable question of being able to drive the entry across the hollow, and the fact that appellees had not received any royalty for two or three years. The deed, on its face, is a valid instrument and its validity must be sustained by the court unless the appellees can show that its execution was procured through fraud, deceit or misrepresentation, or under such circumstances justifying us in cancelling the document and restoring the parties to the position they were in before it was executed. To justify a court in setting aside a contract formally entered into by the parties, the evidence of fraud in its procurement, by either party, should be clearly established. Courts will not lightly set aside a contract in the absence of convincing evidence of fraud and misrepresentation. 9 C. J. 1254; Bispham's Principles of Equity, sec. 473; Salyer, et al. v. Salyer, 141 Ky. 648, 133 S. W. 556; Culton v. Asher, 149 Ky. 659, 149 S. W. 946.

To grant relief in the absence of convincing proof might result in the application of a remedy more oppressive than the evil sought to be cured. Gillespire v. Fulton Oil and Gas Co., 236 Ills. 188, 86 N. E. 219.

The burden of proving fraud or misrepresentation in a suit to set aside an executed contract is generally upon the party aggrieved, a burden which appellees have not sustained. It is not shown that appellant or his associates had knowledge of any advance in the price of coal. Their sole purpose for years had been to sell their interests and thus get rid of an expensive experiment. Kimbley was as well posted on the coal situation as appellant. The deed was executed just about the time there was a change for the better in the coal situation.

The question whether the entry could be driven across the hollow was a questionable one. It seems to have been generally discussed in the neighborhood; some thought it could be done, others held a contrary opinion;

appellee himself testified he never believed they could get through the hollow. Witnesses for appellant say they did not tell appellee that in their opinion they could not drive the entry under the hollow, because some of them were of the opinion it could be done. Practically all agree that the mine would have been valueless unless the entry could have been extended under the hollow, because most of the No. 11 coal in the first hill had been mined. The major portion of the coal remaining was in the hill across the hollow and the cost of the necessary railroad equipment and the opening of a new entry would have been well nigh prohibitive, so costly at least that no one would have undertaken it. The mine had been idle for years. Appellant and his associates had lost something over $40,000.00. They determined never to operate the mine. Unless they operated it or transferred it to some one who would, appellee would get nothing out of it, and this was the situation that confronted him when the deed was executed. He had the choice of accepting $500.00 certain and the prospective payment of a like amount when the property was sold, or suffering the mine to remain idle. Camp and Dickinson say they knew nothing of the final negotiations with the Randles; Kimbley admits that Camp and Dickinson told him Ware was at that time on a trade with the Randles and if the mine was sold it would mean $500.00 more to him. It will be remembered that until their purchase of the company's stock the Randles operated the mine under the lease of October 12, 1916. Leonard Randle says he saw Kimbley most every day after they took charge; he was frequently about the mine, and they discussed the sale of the property. All the parties, including appellee, knew that the Randles were included in the number of persons who had been interviewed with a view to disposing of the mine. It so happens the deal with the Randles was closed the day the deed was executed, but the consummation of the arrangement with the Randles did not of itself insure the operation of the mine or the payment of any royalty. Two other things were necessary, namely, improvement in the price of coal and ability to drive the entry across the hollow. Leonard Randle, introduced by appellees, testifying on this matter, says:

"If it would have been impossible to have gotten across on the other side of the hollow, the lease would

not have been of any value, because he did not have $20.00 worth of coal on this side.''

The fact that coal advanced in price and the entry was extended under the hollow are not grounds for setting aside or cancelling the deed.

It is said that Kimbley was unacquainted with the value of the coal properties. We are not convinced that appellee did not know as much as any one else as to the value of said lands. The whole situation was one of uncertainty and no one knew or could tell just which way the market might go. It was a chance that all had to take.

Counsel say Kimbley was old and infirm and had been weakened by a spell of sickness and was easily persuaded and influenced. The record does not indicate any such condition, but granting that this was true there is nothing shown that would indicate he was overreached in any way, or that any advantage was taken of his alleged impaired physical or mental condition.

Camp and Dickinson deny they told him they were acting for the company; they explained to him the situation and told him why they wanted the deed. They did not conceal from appellee the increasing demand for coal, because the record does not show that the price or demand at this time had increased, nor does the proof show there had then been a substantial agreement with the Messrs. Randle as to the execution of the deed. As before stated there had been previous negotiations but no definite understanding.

It is further claimed that appellee did not intend to convey the two tracts of eight and two and 21/100 acres in fee; his intention was to convey the surface only. When the deed was delivered and handed to appellee he had his daughter read it and when she came to that portion of the deed conveying the two tracts in fee simple he asked Dickinson what ''fee simple'' meant. He says Dickinson told him it had nothing to do with the No. 9 vein and it meant only No. 11. Dickinson denies this and says when he asked him about this term he explained to him it meant the fee, that is, everything, the entire property.

Another contention of appellees is that the deed of October 12th did not contain certain provisions relative to the right to construct entries, exits, tracks, etc., on the land. The proof is overwhelming that the deed

executed is the same one that was drawn by Mr. Trimble, as hereinbefore stated.

The loss to appellee Kimbley in his old age is considerable, though he still has the No. 9 coal. His was not a bad bargain at the time he made it under the conditions existing at the time. Operators were dubious about the situation. The future of the coal market was one of uncertainty. The possibility of driving the entry across the hollow was problematic. Kimbley took a chance as thousands do daily. Is it not true as to practically every business deal or transaction? Later developments show he made a mistake. We all make them, and until our foresight becomes as good as our hindsight we will continue to make them.

After a careful consideration of the record we have been unable to find wherein appellees have shown any reasons or grounds justifying a cancellation of the deed. True it is that equity will seize the opportunity to set aside an instrument procured by fraud, deceit or misrepresentation, but there are no such circumstances here. As has been heretofore stated Kimbley knew the parties had been active in their efforts to dispose of the property. Randle had been at the mine; he had seen him there. In the discussion on October 9th, he was told that Ware was on a deal with Randle. The deed was not executed until three days later; during this time he could have investigated the matter had he so desired, but this he did not do. As late as January or February, 1917, his own witness, Randle, testifies that Kimbley was urging him to buy the property so that he (Kimbley) could get the remainder of the purchase price of $500.00. Randle having purchased the stock of the company appellee Kimbley is entitled to the balance of the purchase price of $500.00.

For the reasons given the judgment is reversed for further proceedings consistent herewith.