## Larmon, et al. v. Miller, et al.

### (Decided June 23, 1922.)

### Appeal from Allen Circuit Court.

1. Cancellation of Instruments—Fraud—Evidence.—One who relies upon fraud in the execution of a writing for its cancellation must establish the same by clear and convincing evidence.

2. Fraud—Presumption—Evidence.—Fraud is never presumed. Something more than a mere suspicion must result from the reasonable inferences to be drawn from the evidence.

3. Cancellation of Instruments—Purchase of Oil Lease—Fraud—Evidence.—Where parties agree among themselves to give $60,000.00 for a named oil lease and thereafter seek out one whom they believe to be able to make an advantageous trade with the owner of the lease for the same, and propose to him that if he can buy said property from the owner they will give him $60,000.00 for it and allow him, as commissions, the difference between the price at which he can buy it and $60,000.00, if any, and in pursuance to such arrangement the person thus sought out buys the lease for $30,000.00 and transfers certain interests in it to the proposed purchasers at the price and on the terms which they had agreed upon, such purchasers are not entitled to a cancellation of their notes given in discharge of a part of the purchase price on the ground

of fraud on the part of their agent in buying the property when it is clearly manifest from the evidence that he acted within and according to the terms of the purchasers' proposition, and this is true even though the oil wells did not produce as much oil as the purchasers themselves believed and represented they would produce.

GILLIAM & GILLIAM, JOHN H. GILLIAM, W. D. GILLIAM, CARRICK & KEENON, KELLEY KASH and JOHN B. RODES for appellants.

U. J. HOWARD, JOHN E. SHEPHERD, S. D. ROUSE and MAX HARLIN for appellee.

OPINION OF THE COURT BY JUDGE SAMPSON—Affirming.

This controversy arose out of a sale by appellee, A. R. Miller, to appellants, Larmon, et al., of the Ike Rickman oil and gas lease on 37½ acres of land situated in Allen county at the price of $60,000.00. Appellants, who were defendants below, by counterclaim asked a cancellation of three promissory notes aggregating $15,000.00, executed by them, on the ground of fraud. On the lease are several oil producing wells and a large quantity of valuable machinery, including power plant, vacuum pumps, pipes and tanks. After Rickman and wife granted the lease it was transferred several times until it reached the Covington Oil Company, incorporated, with offices in the city of Covington, Kentucky. At that time the lease was undeveloped, but there were some wells on farms nearby. The Covington Oil Company gave $10,000.00 for the undeveloped lease. It then employed oil well drillers to sink wells on the property and this was done at great expense. After pumping the wells for several months and marketing oil to the amount of about $6,000.00, the company decided it could increase its production from the wells by installing a certain character of vacuum pumps, and it gave an order for these pumps, which were in the course of a few months delivered on the premises at a cost of about $9,000.00. These pumps were about to be installed when appellee, William Brown, conceived the idea of purchasing the lease from the Covington Oil Company before these pumps were put in operation, anticipating that the flow of oil would be greatly increased by the use of the pumps. He was not able to swing the deal by himself although he was the owner of some oil drilling machinery and some oil leases and perhaps wells. At that time the market price of

crude oil from that district was almost $4.00 per barrel, and there was great activity among oil men in the district. Lease prices were high. He approached appellants, John H. Larmon, Roy W. Hogan and G. I. Bunnell, and suggested that they join him in the purchase of the property at the price of $60,000.00, he proposing to take a one-half interest at $30,000.00. Bunnell agreed to take a one-fourth interest at $15,000.00, and pay $7,500.00 cash and give his note for a like amount; Hogan agreed to take a one-eighth interest at $7,500.00, paying one-half cash and give his note for the remaining one-half; and Larmon agreed to take a one-eighth interest on the same terms, and they each gave their checks for the cash payments and executed their notes to the Covington Oil Company for the balance. A few days later they executed to Miller a mortgage on their interest in the leasehold to secure the $15.000.00 unpaid purchase money. In the meantime Larmon, who lived in about twelve miles of the oil lease, went with Brown to look at the property and according to some of the evidence he visited the property on other occasions and made investigation of the amount of oil produced at the time by the wells. He talked to the man on the lease in charge of the pumping and also to Rickman, who owned the land, and they gave him information concerning the amount of oil produced from the lease per day. Hogan resided in Bowling Green and operated a garage. He did not visit the property until after the purchase. Bunnell lived in Lexington, was about seventy-two years of age, engaged in the oil business, but he never saw the Rickman lease until after it was purchased from the Covington Oil Company. The notes given by Larmon, Bunnell and Hogan were payable six months after date, and were due on July 26, 1920. They were not paid. Each of the payees asked further time and promised to pay as soon as they could raise the money. In the meantime the vacuum pumps had been installed in the wells and a large quantity of oil extracted which, when marketed, brought almost $10,-000.00. After same delay, in which the holders of the notes were pressing for payment, and the buyers, Larmon, Bunnell and Hogan, were asking for further time, this action was instituted in the Allen circuit court by A. R. Miller, the then holder of the notes, against John H. Larmon, G. I. Bunnell and Roy W. Hogan, as payees, and William Brown, an alleged joint owner of the lease, and I. H. Rickman and wife, the owners of the lands and

grantors in the original lease, to recover $15,000.00 with interest on the notes, have the same adjudged a lien upon the leasehold and its equipments and a sale of the property, if necessary, to the payment of the judgment.

The defendants answered and admitted the execution of the notes but denied their liability on the same, avering that the said notes were obtained through fraud on the part of the Covington Oil Company, A. R. Miller and William Brown, and by cross-petition and counterclaim all the facts as understood by Larmon, Hogan and Bunnell were set forth, concluding with a prayer for a cancellation of the notes and the recovery of damages from plaintiff Miller, defendant Brown and the cross-defendant, Covington Oil Company. The company filed answer to the cross-petition and counterclaim, the plaintiff, Miller, filed reply and defendant Brown filed answer, each denying the allegations of fraud contained in the cross-petition and counterclaim of Larmon, Hogan and Bunnell. Issue being joined the parties took a large volume of evidence, principally directed to the issue of fraud in the sale and transfer of the leasehold by the Covington Oil Company and A. R. Miller to Brown, Larmon, Hogan and Bunnell. To support their averment that the notes were obtained by fraud and deceit the defendants, Larmon, Hogan and Bunnell, testified and introduced witnesses to prove that defendant Brown approached them and induced them to buy an interest in the Rickman leasehold with its equipments on the basis of $60,000.00 for the entire property, representing to them at the time that the wells on said lease were then producing forty barrels per day and would produce twice that amount as soon as the vacuum pumps were installed and put into operation, and that defendants believing and relying upon said representation, and not knowing otherwise, bought the interest set forth in their pleading and gave their checks for one-half of the price to Brown, whom they thought was the agent of the Covington Oil Company, and which checks were made payable to said company, and at the same time executed and delivered to him for the said company the notes sued on; that they afterwards learned for the first time that the wells on the leasehold were producing only about ten barrels of oil per day, and the installation of the vacuum pumps had failed to increase the production to eighty barrels per day, or to increase it at all; or, if any but very little. They further testified that Brown repre-

sented to them that the Covington Oil Company's price on the lease was $60,000.00; that he would take one-half interest in the lease at $30,000.00 and pay the cash, and produced and exhibited to them a check made out to the Covington Oil Company for $30,000.00, which he represented to them he was going to deliver to the company as soon as the transfer was made; that, after the trade was made and they had paid their money and executed their notes, each of them learned for the first time that Brown did not acquire a one-half interest in the lease or any interest in it, nor paid $30,000.00 or any sum on the purchase price of the lease. It was also stated in evidence that Miller, who lived in Covington, and Brown, who operated oil well drilling machines in Warren and Allen counties, were in partnership in the drilling of wells and the owning of oil well machinery and oil leases.

For the appellees, Miller, Brown and the Covington Oil Company, it is shown that a short time before the execution of the notes on January 26, 1920, the oil company, then owner of the Rickman lease and all improvements and machinery thereon, became desirous of disposing of the same at the price of $30,000.00. Brown, who had drilled the wells on the lease for the Covington Oil Company at so much per foot, concluding the work several months before the transaction in question, entertained a high opinion of the lease, its oil producing possibilities and its value, and desired to own an interest in it. Brown testified that he in good faith believed the leasehold and equipment to be worth $60,000.00, and thought it a good purchase if it could be had for that sum. Proceeding upon that basis and believing that it was a good opportunity to make money in the oil business, Brown says he approached his friends, Larmon, Hogan and Bunnell, separately, and at different times and places and laid the matter before them and told them he believed the lease was a valuable one and was well worth the $60,000.00 for which he thought it could be purchased and that he was willing to take a one-half interest in it at the price of $30,000.00 and that he told them he believed the suction pumps then about to be installed would greatly increase the production of the wells as it had done in other oil territory under his observation, and that he believed the wells when connected up with the suction pumps would produce enough oil to soon pay for the lease and all the machinery; that he and Larmon went to Covington for the express purpose of seeing A.

R. Miller, who had once owned the Rickman lease and had sold it to the Covington Oil Company, to induce Miller to purchase the lease from the oil company for these appellants at the price of $60,000.00, Miller to have the difference between the price at which he could purchase the lease from the oil company and $60,000.00 as his commission or compensation for making the deal, it being stated at the time of the conference between Larmon, Bunnell and Miller in Covington a short time before the deal was closed that Brown and Larmon, who came from the oil field, were afraid to approach the oil company and offer to buy the lease lest the company and its officials might become excited over the value of the lease and raise the price, and as Miller had been dealing with the company and lived in Covington and knew its officials he would arouse less suspicion and create less excitement if he offered to purchase it; that Miller consented to the arrangement and agreed to attempt to purchase the lease from the oil company and turn it over to appellants and Brown for the price of $60,000.00 and have as his compensation the difference, if any, between the price at which he could buy it and $60,000.00 at which he was to sell it to appellants and Brown. That neither Brown nor Larmon while in Covington visited the offices of the oil company or consulted with any of its officials concerning the oil lease, but returned to Bowling Green to await developments between Miller and the oil company at Covington. All this occurred about ten days before the final consummation of the deal. Miller, the president of the oil company, testified that after the conference with Bunnell and Larmon in Covington, he approached the officers of the oil company and proposed to buy the lease and finally agreed with them upon its purchase at the price of $30,000.00, one-half cash and the balance in six months with interest, the deferred payments to be secured by a lien upon the lease and by notes of Larmon, Hogan and Bunnell, aggregating $15,000.00. Pursuant to this arrangement the oil company sold and transferred the oil lease and all its equipments and appurtenances to A. R. Miller by a writing containing the following provision, dated January 24, 1920:

"Of the consideration herein there remains unpaid $15,000.00, for which A. R. Miller has this day executed his note to the Covington Oil Company, the same to bear interest at the rate of 6% from date until paid, and as

collateral to said note, the said A. R. Miller has attached the note of W. Roy Hogan for $3,750.00, payable six months from date, to the Covington Oil Company; the note of John H. Larmon, for $3,750.00, payable six months from date, to the Covington Oil Company. In addition to the foregoing, the said A. R. Miller agrees to attach to the said notes a certain mortgage, to be executed to him by the parties purchasing said property from him.''

In the meantime, as shown by the evidence of Brown, he had obtained from Larmon a check for $3,750.00 and a note for a like amount, both payable to the Covington Oil Company, and a like check and note from Hogan, also a check for $7,500.00 and note of equal amount from Bunnell, payable to the company, and these were delivered to A. R. Miller who, after paying to the Covington Oil Company $15,000.00 in cash (the total cash paid by Larmon, Hogan and Bunnell), gave to the company his individual note for $15,000.00, due in six months, to which was attached as collateral the note of Bunnell for $7,500.00, the note of Hogan for $3,750.00, and a note of Larmon for $3,750.00. To secure these notes Larmon, Hogan and Bunnell executed to Miller a mortgage on the leasehold and appurtenances for $15,000.00, and this mortgage was attached to Miller's note to the company. On January 26th Miller transferred by separate writing to Bunnell a one-fourth undivided interest in and to the leasehold and its improvements and appurtenances, to Hogan a one-eighth interest, and to Larmon a one-eighth interest, retaining a lien for the unpaid purchase money. No transfer was made to Brown for his one-half interest in the whole lease property. Although it is testified that Brown delivered his check for $30,000.00 to Miller for his one-half interest in the lease, it is admitted that the check was never paid and that Brown never received any transfer of the interest in the lease nor received royalties from the oil produced from the lease. It is shown, however, that a division order was executed between Larmon, Hogan, Bunnell and Miller whereby these persons received their proportion of the oil from the lease and approximated the results, totaling almost $10,000.00 from March to November, 1920.

On this evidence the appellants earnestly insist in long and well prepared briefs that Brown was the agent of the Covington Oil Company, and that he and Miller were partners, the three—Brown, Miller and the Covington

Oil Company—acting together for the purpose and with the intention of deceiving and defrauding Larmon, Hogan and Bunnell, and while thus acting and in pursuance of a general plan they obtained from appellants $15,000.00 in cash and the $15,000.00 in notes which are now the subject of this litigation. We have read and re-read with care the briefs of learned counsel for appellants, and we are unable to agree with them that the evidence is sufficient to establish fraud on the part of the appellee oil company, A. R. Miller or Brown.

While fraud may be and generally is established by circumstantial evidence alone, it must be clear and convincing. Fraud will never be presumed. On the contrary, the presumption prevails that no fraud or wrong has been perpetrated or done. To justify the granting of relief against fraud by a court of equity, evidence of a convincingly probative nature must be produced to sustain the charge. Gahren, Dodge & Maltby v. Parkersburg National Bank, 157 Ky. 266; 31 R. 978; 31 R. 855.

So far as we are able to discover there is not a line or word of competent evidence in the record before us which tends in the slightest degree to prove that the Covington Oil Company and its officials, or any of them, were guilty of fraud or bad faith in the sale of the leasehold to appellee Miller, or in the sale of the same property by Miller to appellants. It did not even have information of the terms or conditions of the sale which Miller made to Larmon and the other appellants so far as the record shows. The only evidence on the subject in the record proves that the company and its officials were entirely ignorant of the character of deal Miller was making or attempting to make with Brown and the other appellants, and that it was not even remotely interested therein. The only evidence relied upon by appellants to prove that Brown was the agent of the company is the statement of appellants alone, denied by Brown, that he (Brown) was the agent of the appellee company. Such statements, even if made, were not competent to prove the agency and did not establish its existence. Brown had not communicated with the company nor entered into any arrangement or agreement with it whereby the lease property was to be sold to appellants or to any one at any price, so far as the record shows, but it is positively shown that he did not have such communication or make such agreement. If Brown was not the agent or sub-agent of and acting for the company at the time and

before the deal, the company was entirely innocent of wrongdoing in connection with the deal and is not and cannot be made liable to appellants for fraud, if any, perpetrated on them.

The only evidence in the record which shows how the deal was originally proposed tends convincingly to prove that Brown, who had great faith in the possibilities of the lease, conceived the whole plan, intending thereby to obtain for himself an interest in the property. He had drilled all the wells on the lease and being an experienced oil man was in position to know something about its production and value. If Brown represented to appellants, Larmon, Hogan and Bunnell, that the lease was then producing forty barrels of oil per day, such representation was false as shown by all the evidence. He says he made no such representation and that he knew it did not produce that much but only yielded about ten barrels per day. This fact he says he made known to appellants. He further says that Larmon, who lived close to the wells, visited the lease in company with him and saw its wells, watched the pumping and talked to the man in charge, who gave Larmon full information about the capacity of the lease. From other evidence we know appellant Larmon visited and inspected the lease more than one time before he purchased an interest in it with the other appellants. He had opportunity to and did investigate the capacity of the wells. From this he was able to figure the reasonable value of the lease. The other appellants made no such investigation although they had opportunity through the invitation of Brown to do so. The weight of the evidence shows that Larmon was quite anxious to acquire an interest in the lease before the vacuum pumps were put in operation for he expected the production of the wells to be greatly increased, and the price of the lease to advance in consequence. Brown and Larmon were animated by the same purpose. They went to Covington for the purpose of consulting appellee Miller and entering into an arrangement with him whereby he was to purchase the lease from the company and turn it over to Brown and appellants at the price of $60,000.00, Miller to have as his commission the difference, if any, between the price at which he could buy the property and $60,000.00. Up to the time of the visit of appellant Larmon and appellee Brown to Miller at Covington, neither the Covington Oil Company nor Miller knew anything of the proposed deal, so far as the evidence shows.

The testimony positively shows there had been no communication of such purpose by either Brown or Larmon to Miller or the company. Notwithstanding this, appellants' counsel insist that there must have been some such previous communications and arrangements. They do not, however, point out evidence to support it. The evidence of appellant Larmon concerning the trip of him and Brown to Covington, is as follows:

"Q. Where did you go? A. To Covington. Q. How did you go? A. In an automobile. Q. Then direct to Mr. Miller's house? A. I don't know that we went direct. Q. Who did you see in Covington with reference to this transaction? A. Nobody. Nobody but Mr. Miller? A. That is all. Q. Did you see anyone else at all in regard to it? A. No, sir, nobody. Q. Did you see anyone else in Covington in connection with this transaction? A. No one else. Q. Then where did you go? A. Back to Lexington. . . . Q. Now, you went up to see Mr. Miller with Mr. Brown, I believe? A. Yes, sir. Q. At whose instance did you go? A. Mr. Brown's. I didn't know he was going there when we started. Q. At that time you had already contracted or agreed to take an interest in this lease? A. Yes, sir, already agreed. Q. Who did you buy from, as you understood it? A. The Covington Oil Company. Q. Did you go to Mr. Miller's at Covington on Sunday and request him, in connection with Mr. Brown, to buy this lease for you all from the Covington Oil Company, stating that you was afraid the Covington Oil Company would require you to pay more than $60,000.00? A. No, sir. Q. You say you thought you were transacting business with the Covington Oil Company all the time? A. Yes, sir. Q. Did you say there you wanted to purchase it before the Covington Oil Company knew that they were installing the vacuum pumps? A. No, sir, I did not. Q. Did you tell Mr. Miller, that to buy it for $60,000.00 and you didn't care how much money he made out of that? A. Nothing like that. Q. Was that talked by you or Brown to Miller, or by Brown in your presence? A. I don't think so. Q. What connection did you understand Mr. Miller had when you were dealing with Brown? A. I thought he was the Covington Oil Company; after we got up there possibly Mr. Brown told me that, I think Brown told me that Mr. Miller was the Covington Oil Company, if I remember right."

His other testimony indicated too plainly he knew all about the deal and how it was conducted though he does not willingly admit it. In telling about the visit of Brown and Larmon to his house in Covington, Miller testified: .

"Mr. Larmon set out the fact that they had agreed amongst themselves that in the event they went to the Covington Oil Company to purchase the property they might have to pay more than $60,000.00 for it, because it might raise a suspicion in their minds as to the results of the vacuum pump; that they wanted to buy it before the Covington Oil Company became possessed of the knowledge of the results obtained by the vacuum pumps, and they thought I would be able to buy the property to a better advantage than they themselves would."

Appellants point with confidence to the fact that Brown did not become the owner of a one-half interest in the oil property as conclusive of the existence of a corrupt secret arrangement between Brown and Miller, and this is the strongest circumstance in appellants' favor. The explanations given by Brown and Miller are reasonable. Brown, they say, gave Miller his check for $30,000.00 for a one-half interest, expressly stating at the time that he did not have that much cash in bank but would soon have that sum from the sale of certain oil property which he expected to sell right away. Miller accepted the check but gave Brown no assignment of an interest in the lease on account, as he says, of the verbal arangement made between them, whereby Miller was to hold the interest in the lease as security for the payment of the check. Brown failed to make his oil deals and could not meet his check. The matter drifted along for awhile until the oil business began to wane. This suit was brought by Miller on the notes. Concerning this Miller testified:

"I—on several occasions—pressed Mr. Brown for the payment of this check, as well as other money that was due me from him. In order to secure me he made a transfer to me of his entire interest in this property, with the understanding that it was to be re-transferred to him as soon as he was able to pay the $30,000.00, setting out the fact that his failure was because of the fact that his deals that were pending had not materialized."

Against this positive evidence for appellees there is only interposed the circumstance that Miller failed to convey to Brown an interest in the lease but gave to

Brown a receipt in a daybook, showing that Brown had paid to Miller a check for $30,000.00 for a half interest in the lease. This, it is urged, is strong evidence of fraud. The receipt in the daybook, signed by Miller, is not at variance with the explanation made by Miller and Brown concerning the nonpayment. of the $30,000.00 check and the failure of Miller to convey a one-half interest in the lease to Brown. As Miller retained the check for $30,000.00, Brown was entitled to something showing he had or was to receive an interest in the lease. The explanation given by Brown and Miller, in the absence of evidence to the contrary, is so entirely reasonable that even the circumstance of the unpaid check and the daybook receipt fade to the neglible.

A careful reading of all the evidence gives an impelling impression that appellants were not caused to purchase the oil lease at $60,000.00 so much by representations of Brown as by the general prevailing excitement over the oil business in that field, and the wild stories of large fortunes quickly realized from such investments. Certainly there is no evidence that Miller was guilty of fraudulent conduct which led appellants to buy the lease at a high price. He was asked by Brown and Larmon to make the purchase on the assurance that if he could buy it they would pay him $60,000.00 for the lease. He found he could buy the property at less than $60,000.00 and he wanted to make the difference which the proposed purchasers agreed he should have. All this was but natural. If the facts with respect to the negotiations which led up to the deal, were not as stated by Brown and Miller we are unable to say, from the evidence, how the deal came about, or what were its terms and conditions. Larmon only half-heartedly denies his part in the conversation which led to the purchase agreement with Miller at Covington, while both Brown and Miller speak out plainly. On this point the decided weight of the evidence is against appellants. If the deal was brought about by the meeting at Covington, as stated by Brown and Miller, appellants were not wronged and have no just ground of complaint. Had the vacuum pumps come up to appellants' expectations and the oil business continued good they would have made money from the deal, but when it closed down with the general business depression, and crude oil, which was selling at about $4.00 per barrel at the time of the deal, brought

only about sixty cents, appellants were unable to meet their notes, hence this lawsuit.

Without evidence, either direct or circumstantial, tending strongly to establish fraud, courts of equity are not authorized to cancel the obligations of *sui juris* parties to such contract.

Perceiving no error to the prejudice of the substantial rights of appellants, the judgment is affirmed.

Judgment affirmed.