# Fields v. Cornett et al.

(Decided April 24, 1934.)

36

CRAFT & STANFILL, for appellant.

J. K. P. TURNER, for appellees.

OPINION OF THE COURT BY JUDGE RICHARDSON—Affirming.

The right of vendees to have canceled or rescinded a deed, purporting to convey the land with the coal and other mineral rights, the latter at the time not owned by the vendor, is the decisive issue for solution.

Henry C. Fields, on March 18, 1929, executed and delivered a deed conveying to Mary Belle Cornett and Tilden Cornett, a tract of land in Perry county, for the consideration of $1,500, of which $350 was cash; $600, the value of lots, conveyed by the Cornetts to Fields; and the balance evidenced by their note of $550. The land conveyed by Fields to the Cornetts is described by metes and bounds in the deed, followed by the statement it contains 200 acres "more or less," excepting 2 acres reserved.

The Cornetts took possession of the land, and thereafter leased it for coal and other minerals, when they claim they discovered for the first time there had been a severance of the title of the coal and minerals and that of the surface of the land, and the former were not owned by Fields at the time he executed and delivered the deed. The deed is dated March 18, 1929. This action was filed by Fields on the 7th day of May, 1931,

to recover of the Cornetts the $550 note and interest and to enforce a lien on the land to satisfy same.

The Cornetts filed an answer and counterclaim and made it a cross-petition against the Colony Coal & Coke Corporation, alleging it owned in fee simple the coal and other minerals on and under the land conveyed by Fields. The Colony Coal & Coke Corporation was adjudged the ownership of all coal and minerals thereon. While the action was pending, the land covered by Cornett's deed was surveyed, and it was discovered it contained 125 acres. In their amended answer and counterclaim they charge Fields "stated to them at the time [the deed was executed and delivered], he could give them a general warranty deed therefor and they were led by that statement to believe he did own the minerals thereon and for that reason they did not at the time question the fact or investigate whether the land contained approximately 200 acres, when in truth and fact, it contained only 125 acres, which fact they did not know at the time they purchased same and did not know this until same was surveyed by the defendant, Colony Coal and Coke Corporation, and testified to by its engineer."

Issue was joined on the allegations of the amended answer and counterclaim of the Cornetts, and, on the evidence, the chancellor decreed a rescission of the deeds of the respective parties; canceled the $550 note, and directed a reconveyance by the parties of the land deeded by the one to the other. The Cornetts tendered a deed to the plaintiff conveying to him the land embraced in the deed he executed and delivered to them. Fields had conveyed to his son the lots which had been deeded him by the Cornetts. The court directed that, if he failed for the time fixed in the judgment to reconvey the lots to the Coretts, he pay them $600, the agreed price of the lots and also the $350, the cash paid by Cornetts, with interest.

We have not been favored with a brie1 of the Cornetts. Fields testified that he informed Tilden Cornett, before the trade concerning the land was closed, that he did not own the coal and minerals under the land or at least a part of it. B. T. Fields, the father of Henry C. Fields, testified he had a conversation with Tilden Cornett, before Henry C. Fields made the deed to the Cornetts, when Cornett asked him to whom the minerals

were sold, and stated "somebody had told him that this old Horsley deed was kindly shaky and he would like for him to help him get it back," when he directed Cornett "to get a lawyer, and get him to advise him."

Cornett denied he had had a conversation with either of the Fields concerning the coal and mineral rights or that either of them made the statement to him detailed in their respective testimony, until after he had received the deed from Henry C. Fields. The Cornetts had an abstract prepared of the title to the land covered by the Fields deed; they leased the same for oil, and claim thereafter they discovered for the first time that Henry C. Fields did not own the coal and mineral rights at the time he executed and delivered to them the deed. It is shown by the record that neither Fields nor the Cornetts had any information or knowledge that the land contained only 125 acres until it was surveyed by an engineer of the Colony Coal & Coke Corporation during the pendency of this action.

The trial court accepted the testimony of the Cornetts in regard to their knowledge of the fact Fields did not own the coal and mineral rights and did not disclose to them the fact he did not own the same until after the execution and delivery of the deed. The fact the deed contains a covenant of general warranty not only corroborates the Cornetts in their statement to the effect that prior to, and at the time of, the delivery of the deed, they had no knowledge of a separation of the title of the coal and minerals and that of the soil, and that Fields did not own the former. The whole of the evidence sustains the chancellor's finding of facts. The land in controversy is mountain land, with improvements of little value and soil of no fertility. It contains coal and is embraced in a large area of coal land owned by the Colony Coal & Coke Corporation for the purpose of development. The fact the 200 acres described in the deed only embraces 125 acres is not disputed, and that Fields did not own and did not convey by his deed to the Cornetts the coal and mineral rights are not disputed. According to the deposition of Fields, he sold and conveyed the coal and mineral rights in 200 acres when in truth he owned and conveyed only the surface of 125 acres subject to the title and right of the owner of the coal and minerals thereunder. It is not doubtful Fields did not own or convey, and the Cornetts

did not receive, the property which Fields agreed and undertook to convey them.

In Lossie v. Central Trust Co. of Owensboro, 219 Ky. 1, 292 S. W. 338, 340, the familiar doctrine of such cases was stated in this language:

> "The cancellation of an executed contract is the exertion of the most extraordinary power of a court of equity, which ought not to be exercised, except in a clear case and on strong and convincing evidence. See Fields v. Walker, 200 Ky. 710, 255 S. W. 518; Larmon v. Miller, 195 Ky. 654, 243 S. W. 939; Camp v. Kimbley, 188 Ky. 666, 223 S. W. 1005; 9 C. J. 1254, section 195."

In Perry v. Thomas et al., 232 Ky. 781, 24 S. W. (2d) 603, 604, we quoted with approval a statement of this principle from Atlantic Delaine Co. v. James, 94 U. S. 207, 214, 24 L. Ed. 112, in this language:

> "Cancelling an executed contract is an exertion of the most extraordinary power of a court of equity. The power ought not to be exercised except in a clear case, and never for an alleged fraud, unless the fraud be made clearly to appear; never for alleged false representations, unless their falsity is certainly proved, and unless the complainant has been deceived and injured by them."

In Vaughn et al. v. Wells, 180 Ky. 485, 203 S. W. 191, it is written:

> "That rule, however, does not apply where the vendor sues for the purchase money due under an executed contract with covenants of warranty, and the vendee whose possession had not been disturbed asks a rescission on the ground of defective title and the nonresidency of the vendor. It is only where the vendor seeks specific performance of an executory contract with covenants of warranty that he is required to exhibit a good legal title. Payne v. Cabell, 7 T. B. Mon. 198. Here the defendants are in the undisturbed possession of the property under an executed conveyance with covenants of warranty; and in such a case a bill for the dissolution of the contract cannot be sustained, and the payment of the consideration enjoined, except in the case of fraud, insolvency, or nonresidency of the vendor, and a palpable and threatening danger

of immediate or ultimate loss without legal remedy, by reason of the defects in the title conveyed, and the inability of the vendee to protect himself against eviction under it."

These accepted principles are not in conflict with the generally accepted rule that "a deed may be canceled on the ground of mistake, where it is shown there was no meeting of the minds of the parties, if the application to cancel is timely made, but a mistake on one side may be grounds for rescinding the contract or deed, but it is no ground for reforming the instrument. Bell v. Carroll, 212 Ky. 231, 278 S. W. 541; Fidelity & Cas. Co. v. Waugh, 222 Ky. 198, 300 S. W. 592." Reiss v. Wintersmith, 241 Ky. 470, 44 S. W. (2d) 609, 613.

"'A mutual mistake is one in which both parties participate by each laboring under the same misconception.' Coleman v. Ill. Life Ins. Co., 82 S. W. 616, 26 Ky. Law Rep. 900." Reiss v. Wintersmith, supra.

It is hardly conceivable that Fields intended to price 200 acres of land containing the coal and minerals thereunder and sell and convey to the Cornetts only 125 acres without the coal and minerals thereon. It is inconceivable that the Cornetts would agree to pay the price of the 200 acres with the coal and mineral thereon, and, so believing, knowingly accept a deed to only 125 acres without the right to the coal and mineral thereunder. Disregarding the statement of the Cornetts that Fields represented to them that he could and would convey the 200 acres with a "genuine deed" as the Cornetts claim, the decree of the circuit court may be well rested upon the principle admirably expressed in Story's Equity Jurisprudence, sec. 1381:

"But where the mistake is of so fundamental a character that the minds of the parties have never in fact met, or where an unconscionable advantage has been gained by mere mistake or misapprehension, and there was no gross negligence on the part of the plaintiff, either in falling into error or not sooner making redress, and no intervening rights having accrued and the parties may still be placed in statu quo, equity will interfere in its discretion to prevent intolerable injustice."

The principles stated by Mr. Storey often have been applied by this court where the facts warranted it. In

a note to Hurst v. National Bond & Investment Co., 96 Fla. 148, 117 So. 792, 59 A. L. R. 807, the general rule is succinctly stated thus:

"Equitable relief from a mutual mistake is frequently given by a reformation of the contract. But a contract will not be reformed for an unilateral mistake. Equitable relief may, however, be given from an unilateral mistake by a rescission of the contract. Essential conditions to such relief are: [1] The mistake must be of so grave a consequence that to enforce the contract as actually made would be unconscionable. [2] The matter as to which the mistake was made must relate to a material feature of the contract. [3] Generally the mistake must have occurred notwithstanding the exercise of ordinary diligence by the party making the mistake. [4] It must be possible to give relief by way of rescission without serious prejudice to the other party except the loss of his bargain. In other words, it must be possible to put him in statu quo."

This court has often approved this principle. See Green et al. v. Collett, 231 Ky. 215, 21 S. W. (2d) 252; Miracle v. Stone, 190 Ky. 610, 227 S. W. 1011; Henderson v. Adams, 182 Ky. 280, 206 S. W. 461; McKibben v. Diltz, 138 Ky. 684, 128 S. W. 1082, 137 Am. St. Rep. 408; Bell v. Carroll, 212 Ky. 231, 278 S. W. 541; Board of Regents of Murray State Normal School v. Cole, 209 Ky. 761, 273 S. W. 508; Fidelity & Cas. Co. of N. Y. v. Waugh, 222 Ky. 198, 300 S. W. 592; Reiss v. Wintersmith, supra.

The court may not make or enforce a contract for the parties which they did not make, but it may set aside a contract which in fact the parties made on the ground of an unilateral mistake; that is, where it is a palpable mistake or convincingly and clearly shown the minds of the parties in fact did not meet.

Fields not owning the coal or mineral rights in the land and the boundary conveyed actually contained only 125 acres when both parties were of the impression it contained 200 acres, it is very clear from these facts the minds of the parties did not meet, and that the deed, if not executed by mutual mistake of the paries, was accepted by the Cornetts by and through a mistake, which equity will correct, since the parties can be placed in statu quo according to intrinsic equity. Aside from

this, in enforcing the equitable right of rescission, a court of chancery will, as the necessities of the case require, afford relief either by direct reconveyance or simply by ordering the instrument to be surrendered for cancellation. This relief is based upon the equities which arise out of actual fraud or mistake. Ison et al. v. Sanders, 163 Ky. 605, 174 S. W. 505; Howard v. Sebastian et al., 143 Ky. 237, 136 S. W. 226; Fischer v. Hillman, 68 Wash. 222, 122 P. 1016, 39 L. R. A. (N. S.) 1140; Jay v. Sweatt, 8 Ga. App. 481, 70 S. E. 16; Strothers v. Leigh, 151 Iowa, 214, 130 N. W. 1019.

The Cornetts were authorized to infer and believe from the statements of Fields to them that "I can make you a genuine warranty deed for the land" there was no separation of the title of the coal and minerals and that of the soil and that he owned the coal and minerals therein and was proposing to sell and convey them both the surface and the coal and mineral rights with a covenant of general warranty. They were entitled to presume that he knew what he owned and was qualified to convey, and the withholding from them the fact that he did not own the coal and mineral rights was equivalent to concealment of the facts concerning the coal and mineral rights. Actionable fraud may consist of the concealment of what is true as well as the assertion of what is false. Fraudulent concealment implies knowledge of the fact concealed, which knowledge may be presumed or drawn from inference. Adkins v. Stewart, 159 Ky. 218, 166 S. W. 984.

The testimony of Fields and his father in their separate conversations with Tilden Cornett, to the effect they informed him that Henry Fields had no title to the coal and minerals before the deed was delivered, in the circumstances is not to be outweighed by the testimony of the Cornetts so strongly corroborated by the deed conveying the land so as to include the minerals with a covenant of general warranty. Bearing this in mind and the principles last reiterated herein, the Cornetts were entitled to have the deed canceled and the property restored. Ison et al. v. Sanders, supra.

Wherefore the judgment is affirmed.