RENDERED:  OCTOBER 15, 2021; 10:00 A.M.
NOT TO BE PUBLISHED

# Commonwealth of Kentucky

# Court of Appeals

NO. 2020-CA-0992-MR

TIMOTHY LUNSFORD AND
DEBORAH J. LUNSFORD                                        APPELLANTS


v.                      APPEAL FROM SCOTT CIRCUIT COURT
                        HONORABLE BRIAN PRIVETT, JUDGE
                        ACTION NO. 18-CI-00766


CENTRAL BANK AND TRUST
COMPANY; CAROLYN
CARROWAY, SCOTT COUNTY
MASTER COMMISSIONER; LEE D.
BAYER; NATHAN D. WRIGHT;
VICKIE BAYER; WESBANCO
BANK, INC., SUCCESSOR BY
MERGER TO UNITED BANK &
CAPITAL TRUST COMPANY; AND
WINTHORPE ENTERPRISES, INC.                                APPELLEES


OPINION
REVERSING AND REMANDING

** ** ** ** **

BEFORE:  ACREE, CALDWELL, AND LAMBERT, JUDGES.

CALDWELL, JUDGE:  Timothy and Deborah Lunsford appeal from the Scott Circuit Court's denying them an evidentiary hearing on their exceptions and a refund of their deposit.  The Lunsfords had submitted the highest bid at a master commissioner sale for property including a house.  But they contended that the sale should be set aside because someone–apparently, one of the owners who lost the house in foreclosure–removed fixtures and other items including cabinetry, doors, appliances, toilets, bathtubs, and the heating and air system shortly before the sale.

The trial court ultimately ruled that the Lunsfords must forfeit their deposit based on application of the *caveat emptor* doctrine.[1]  The Lunsfords argue that the trial court erred in failing to recognize exceptions to the *caveat emptor* doctrine in judicial sales and in denying them the opportunity to prove their exceptions through an evidentiary hearing.  They request that this Court reverse and remand with instructions to enter an order for a refund of the Lunsfords' deposit or, in the alternative, for an evidentiary hearing.

After careful review of the record and of applicable law, we reverse and remand with instructions to enter an order to refund the Lunsfords' deposit.

---

[1] *See Caveat Emptor*, BLACK'S LAW DICTIONARY (11th ed. 2019): "[Latin "let the buyer beware"] (16c) A doctrine holding that a purchaser buys at his or her own risk. • Modern statutes and cases have greatly limited the importance of this doctrine."

## FACTS AND PROCEDURAL HISTORY

Appellee, Central Bank and Trust Company ("Central Bank"), filed a complaint to foreclose on mortgages it held on property in Georgetown, Kentucky. Wesbanco Bank, Inc., d/b/a United Bank and Trust Company ("Wesbanco"), held the first mortgage on the property and was named as a defendant. Also named as defendants were borrowers Nathan Wright and Lee and Vickie Bayer.

In early May 2019, the trial court ordered the property to be sold by the master commissioner upon Wesbanco's motion and entered a Judgment and Order of Sale ("JOS"). The JOS stated that Central Bank's interest was junior and inferior to that of Wesbanco and that, subject to an exception not relevant here,[2] "[t]he real estate shall be sold on the terms of 10% cash at the time of the sale . . . ." (Record ("R."), p. 181.) Further terms stated that the risk of loss passed to the purchaser on confirmation and that Wesbanco would not be deemed to have warranted title. But there were no explicit terms regarding the sale being *caveat emptor* or "as is."[3]

---

[2] Special provisions would apply if Wesbanco were the highest bidder, including waiver of the deposit.

[3] *See As Is*, BLACK'S LAW DICTIONARY (11th ed. 2019):

> In the existing condition without modification <the customer bought the car as is>. • Under [Uniform Commercial Code] UCC § 2-316(3)(a), a seller can disclaim all implied warranties by stating that the goods are being sold "as is" or "with all faults." Generally, a sale of property "as is" means that the property is

Prior to the sale, two housekeepers submitted their appraisal of the property which was filed in the record as called for in Kentucky Revised Statute ("KRS") 426.520.  They appraised the property to be worth $410,000.

The master commissioner sale occurred on May 28, 2019.  The Lunsfords offered the highest bid–for $324,000.  They paid the required 10% deposit ($32,400) to the master commissioner and signed a Sale Bond[4] to pay the balance of the sale price.

According to the Lunsfords, they (along with others) had entered the house on the property a few days before the sale as it had been left unlocked.[5]  The house and rest of the property appeared to be in good condition at that time.  But

---

sold in its existing condition, and use of the phrase *as is* relieves the seller from liability for defects in that condition. – Also termed *with all faults.*

[4] The Sale Bond begins with a statement that the Lunsfords promise to pay to the master commissioner the balance of the purchase price minus the deposit, with 4.625% interest until paid.  The Sale Bond states:  "This bond is security for the payment for a tract of land" sold by the master commissioner on May 28, 2019 as described in the trial court's judgment.  (R., p. 227.)  The Sale Bond further recites:  "This bond shall have the force and effect of a Judgment; and to secure payment of this bond a lien is hereby retained in favor of said Master Commissioner upon said property."  (R., p. 228.)  The bond signed by the Lunsfords also states that surety was "provided by written verification from lender approving loan to purchaser in an amount in excess of balance of purchase price[.]"  (R., p. 228.)

[5] Although Central Bank asserts the Lunsfords had trespassed, the parties have not pointed to anything in the record showing definitively whether any owner or occupant had expressly permitted entry by prospective purchasers prior to the sale.  At a court hearing, Central Bank's attorney stated that generally a bank would lack the authority to lock up a house under foreclosure so long as the house was occupied and that Central Bank representatives believed the house was still occupied prior to the master commissioner sale.  *See also* KRS 426.525.

-4-

the house was locked up the last few days before the sale so they could not get in anymore to inspect it.

On the evening of May 28, (the date of the sale), the Lunsfords went into the residence on the property and discovered that fixtures including toilets, bathtubs, doors, appliances, the heating and air conditioning system, and cabinetry had been removed. They filed a police report about the theft that night.

The master commissioner's report of the sale was filed on May 29. The report stated that the Lunsfords submitted the highest bid–for $324,000–and executed a sale bond pursuant to the terms and conditions of the trial court's order of sale. Apparently, the purchase price offered by the Lunsfords would have been sufficient to pay off the mortgages held by both Wesbanco and Central Bank.

In early June, the trial court granted Central Bank's motion for summary judgment against the Bayers and for an *in rem* default judgment against Wright. Central Bank was awarded money judgments of nearly $75,000 against Mr. Bayer and over $38,000 against Wright–plus interest, attorney fees, court costs, and expenses. And the trial court adjudged Central Bank to have valid liens superior to all others except Wesbanco.

Also, in early June, the Lunsfords filed a statement of their exceptions and/or objections to the master commissioner's report. As grounds, they alleged that unbeknownst to them, the property had been "substantially and materially

altered and damaged by the removal of numerous fixtures and other integral parts of the structure of the property just prior to the sale . . . ." (R., pp. 239-40.) They alleged that the property's value "was substantially and materially affected" due to the removal of the fixtures and other items and that they had a reasonable expectation that such fixtures were present in the property and would remain present until after the sale. (R., p. 240.) And they asserted that removal of the fixtures and other items cast doubt on the accuracy of the appraisal. The Lunsfords later submitted into the record professionals' estimates that the cost of repairing the house and putting it back in its original condition would be about $96,000.

Later that summer, the banks and the Bayers moved the trial court to confirm the sale. The Lunsfords objected to the motions to confirm the sale. The Lunsfords also moved the trial court to set aside the master commissioner sale and to refund their deposit. The banks and the Bayers filed responses objecting to the motion to set aside the sale. The Lunsfords moved for an evidentiary hearing on their exceptions to the master commissioner's report of sale.

Following the filing of these motions over the summer, Central Bank filed a motion in September 2019 requesting that the trial court have the master commissioner re-sell the property if the Lunsfords would not complete their purchase upon confirmation of the sale. After the failure of efforts to get insurance

to pay for the losses and to work out a mutually satisfactory resolution,[6] the Lunsfords indicated that they would not be completing their purchase.

The Lunsfords had submitted into the record, *inter alia*, the affidavit of a neighbor who witnessed Wright removing and/or admitting to removing fixtures from the house at issue a day or two before the sale. Wright had never participated in the action and a default judgment had been entered against him. Apparently, none of the other parties in this case–including his co-borrowers and relatives, the Bayers–has disputed that Wright was involved in removing the fixtures. In response to the trial court's inquiry at one hearing, counsel noted that no criminal complaint had been filed against Wright–or apparently anyone else–for the damage and removal of fixtures.

In October 2019, the trial court granted Central Bank's motion for re-sale by the master commissioner by written order. The trial court granted the motion based on the Lunsfords' indicating in court that they would not "complete their purchase of the Property pursuant to the Master Commissioner sale held on May 28, 2019 and subsequently confirmed herein." (R., p. 437.)

The trial court further ordered the master commissioner to hold the Lunsfords' deposit in escrow pending further orders and reserved other issues for

---

[6] For example, at a hearing, the Lunsfords indicated that they might be willing to pay $96,000 less than their bid to complete the sale or that they might pay the full $324,000 after the house was repaired to its prior condition.

further determination. The trial court orally stated at hearings in the fall of 2019 that he was holding off on certain rulings–apparently regarding what would happen to the Lunsfords' deposit–to see if insurance would cover the damage to the house to avoid a harsh result to the Lunsfords.

The property was then offered for sale again by the master commissioner. According to a new appraisal by the same housekeepers as before, the property was now worth $300,000. The Lunsfords submitted affidavits from these same housekeepers indicating that their original appraisals would have been very different if they had been apprised of the removal of the fixtures.

In November 2019, the property sold for $250,000 at the second master commissioner sale. The trial court confirmed the second sale and directed distribution of the proceeds in early 2020. The $250,000 purchase price was sufficient to satisfy the Wesbanco mortgage. But it paid only a portion of the second mortgage and none of the third mortgage held by Central Bank.

Central Bank then filed a motion seeking disbursement of the Lunsfords' $32,400 deposit to it in January 2020. It pointed out that the re-sale brought $74,000 less in proceeds than the price the Lunsfords agreed to pay. It also noted it was still owed over $50,000 on the June 2019 judgments awarded to it against the Bayers and Wright.

Central Bank argued the Lunsfords' deposit should be paid to it because of harm caused by their refusal to complete the first sale. Specifically, Central Bank pointed out that the mortgages would have been paid in full if the Lunsfords had completed their purchase. And Central Bank also asserted that delay caused by the Lunsfords' refusal to complete the sale resulted in additional expenses including increased taxes, interest, and attorneys' fees. So, Central Bank requested that the court order the master commissioner to pay the Lunsfords' deposit to Central Bank "to be applied to the judgments awarded to it [Central Bank] . . . ." (R., p. 489.)[7]

After the filing of the Lunsfords' response and a hearing, the trial court granted the motion to disburse the Lunsfords' deposit to Central Bank in June 2020. The Lunsfords then filed a motion to alter, amend, or vacate. The trial court denied this motion after a hearing and the Lunsfords then filed a timely appeal.

## STANDARDS OF REVIEW

As the parties acknowledge in their briefs, the trial court's resolution of pure questions of law–such as interpretation of contracts or statutes or other legal authority–is subject to non-deferential *de novo* review on appeal. *See, e.g.*,

---

[7] In its written motion, Central Bank requested that the deposit be applied "to the judgments awarded to it herein." (R., p. 489.) The motion referred to the judgments awarded to Central Bank against the Bayers and Wright in June 2019. Central Bank's motion cited no legal authority addressing why the Lunsfords' deposit should be used to pay off judgments against other parties–the Bayers and Wright.

*Seeger v. Lanham*, 542 S.W.3d 286, 290 (Ky. 2018) (questions of law including statutory construction are subject to *de novo* review on appeal); *EQT Production Company v. Big Sandy Company, L.P.*, 590 S.W.3d 275, 285 (Ky. App. 2019) (questions of construction of contracts, deeds, and trusts reviewed *de novo*).[8]

We review a trial court's decision to confirm or set aside a judicial sale[9] for abuse of discretion. *Lerner v. Mortgage Electronic Systems, Inc.*, 423 S.W.3d 772, 773 (Ky. App. 2014). Similarly, we review rulings on evidentiary issues–such as whether to admit or exclude evidence–for abuse of discretion. *Goodyear Tire & Rubber Co. v. Thompson*, 11 S.W.3d 575, 577 (Ky. 2000). With these applicable standards of review in mind, we address the issues presented by the Lunsfords and Central Bank in their briefs.

---

[8] Any findings of fact by the trial court should be disturbed only if clearly erroneous. Kentucky Rules of Civil Procedure ("CR") 52.01. But from our review of the record, the trial court did not formally issue factual findings and the parties have not argued any error in factual findings in their appellate briefs.

[9] At times, the documents in the record seem conflicting as to whether the trial court had actually confirmed the first commissioner sale of May 2019. In an October 2019 order, the trial court states it had overruled the Lunsfords' exceptions and confirmed the commissioner sale of May 2019. Then later, after a second master commissioner sale was conducted and confirmed, Central Bank filed a motion to disburse the deposit paid by the Lunsfords in the "unconfirmed" first master commissioner sale of May 2019. (R., p. 487.) The trial court granted this motion. But despite the confusing state of the record, the parties both discuss the May 2019 sale as never having been confirmed in their briefs.

**Any Reversible Error in Trial Court's Application of *Caveat Emptor***

Whether and how *caveat emptor* ("buyer beware") applies to the facts here is a legal determination subject to *de novo* (non-deferential) review on appeal. *Manning v. Lewis*, 400 S.W.3d 737, 741 (Ky. 2013).

The trial court repeatedly orally stated in hearings that master commissioner sales are *caveat emptor* sales. The Lunsfords argued that while generally this may be true, such *caveat emptor* rules are nonetheless subject to certain exceptions such as for mutual mistake or for fraud by someone connected with the sale. While the trial court orally indicated it was aware that there may be certain exceptions to the *caveat emptor* rule, it seemingly did not believe any such exception could possibly apply to this case and that all master commissioner sales were at the buyer's risk and/or as is. And it stated that although the rule was harsh, it believed that "the statute" would have to be changed for the Lunsfords to escape the application of *caveat emptor* to bar refund of the deposit.[10] (Video Record ("V.R.") 9/12/2019 2:07:40-2:08:18.)

---

[10] Despite the trial court's reference to a statute which apparently meant that the Lunsfords were obligated to go through with their purchase or at least forfeit their deposit regardless of the property's condition, there appears to be no Kentucky statute which expressly states that all master commissioner or judicial sales are "as is" or totally without warranty and at the buyer's risk. However, some statutes indicate that newspaper advertisements of judicial sales should state the terms of sale and that the court can require the payment of a deposit to cover expenses if a resale becomes necessary. *See* KRS 426.560 (newspaper advertisements for judicial sales must "state the time, place and terms of sale and describe the property to be sold"); KRS 451.170 (stating that judicial sales can be for cash or credit and that court may require the payment of a deposit sufficient to cover the expense of a resale).

Although we are unaware of any express provision in current statutes and court rules that judicial sales (including master commissioner sales) are always of the property "as is" at the time of sale, Kentucky case law has long generally applied the doctrine of *caveat emptor* to judicial sales/master commissioner sales. *See, e.g.*, *Trigg v. Jones' Adm'r*, 19 Ky. L. Rptr. 1009, 102 Ky. 44, 42 S.W. 848, 849-50 (1897) ("There can be no question that the rule of caveat emptor applies to judicial sales of real property, and, in the absence of misconception and fraud, the buyer must look out for himself. He buys at his own risk, both as to title and quantity.").

---

Similarly, court rules generally require that the terms of a master commissioner or judicial sale are to be stated in the judgment ordering the sale and in the notice of sale to the public–but do not expressly provide that judicial sales are always "as is" with no warranties. *See* CR 53.02(1) ("Judicial sales under order or judgment of the circuit court may be executed and accounts of estates may be settled by a master commissioner under such terms and conditions as are specified by the circuit court either in its order or judgment or by rule."); KENTUCKY ADMINISTRATIVE PROCEDURES OF THE COURT OF JUSTICE IV, Sec. 5, *General Provisions of Judicial Sales* (requiring *inter alia* that advertisement for judicial sale state time, place, and terms of sale); RULES OF PRACTICE AND PROCEDURE OF THE 14TH JUDICIAL CIRCUIT, BOURBON, SCOTT, AND WOODFORD COUNTIES, *Rule XXXVIII*) (local trial court rule requiring in Paragraphs E and F that judicial judgment and order of sale contain legal description of property and name of party whose interest will be sold, source of title, and "[t]erms specifying that said property shall be sold on a date and time to be fixed by the Master Commissioner . . ." and that the master commissioner's advertisement of sale state "time, terms, place of sale and description of the property to be sold."). *See also Sterling Grace Mun. Corp. v. Central Bank & Trust Co.*, 926 S.W.2d 670, 673 (Ky. App. 1995) ("the terms of a judicial sale are ultimately determined by the circuit court").

Although not discussed by the parties in their appellate briefs, we found nothing in the trial court's order and judgment of sale nor in the master commissioner's notice of sale which expressly provided that the property was being sold as is. Nor does the local court rule expressly provide that all master commissioner sales are as is or that buyers buy at their own risk.

-12-

Still, Kentucky case law has also long recognized that in certain instances, exceptions to *caveat emptor* apply–even to property sold by a master commissioner in a judicial sale–such that a judicial sale may be set aside. For example, in acknowledging that the *caveat emptor* rule applies to judicial sales of real property "in the absence of misconception or fraud," the *Trigg* decision suggests that there are potential exceptions to *caveat emptor.*

Judicial sales should not be easily disapproved,[11] especially for a party's mere dissatisfaction with the price at which the property sold. But sometimes judicial sales should be set aside for extraordinary circumstances including fraud, unfair or irregular proceedings, mistake, or the price itself simply shocking the conscience of the court. *Courtyards*, 594 S.W.3d at 209-10. For example, this Court noted the deferential abuse of discretion standard of review and upheld a trial court's setting aside a judicial sale based largely on the sale price

_____

[11] As Central Bank's brief indicates, both more recent and longer-standing precedent reflects perhaps a general preference for upholding judicial sales. *See, e.g.*, *U.S. Bank N.A. v. Courtyards University of Kentucky, LLC*, 594 S.W.3d 205, 209 (Ky. App. 2019) (indicating that judicial sales should generally be upheld if proceedings were conducted in a fair and regular manner in the absence of "substantial reasons" not to confirm a sale); *Jones v. Deposit & People's Bank*, 180 Ky. 395, 202 S.W. 907, 910 (1918) ("the policy of the law [is] to sustain judicial sales and to encourage bidding by all persons, in order that the property not be sacrificed" so setting aside a sale for insignificant reasons is discouraged). Nonetheless, promoting public confidence in judicial sales is a valid goal which may not be served by confirming judicial sales under certain circumstances. Thus, as discussed in the body of this Opinion, there have certainly been other cases in which Kentucky appellate courts have seen fit to reverse a trial court's confirmation of a judicial sale despite the general preference to uphold judicial sales absent extraordinary circumstances.

being only about ten percent of the property's appraised value–which the trial court had found so low as to shock its conscience–in *Lerner*, 423 S.W.3d at 773-74.

Even when the price alone is not sufficient to shock the conscience of the court, confirmation of a judicial sale may not be appropriate if the party challenging confirmation can establish fraud by someone connected with the sale, irregularity in the proceedings, or mistake or other reason casting doubt on the sale's fairness:

> A sale price which is not low enough to shock the conscience may still be grounds for vacating a judicial sale if other circumstances are present which cast doubt on the fairness of the process. "[T]here must be either fraud or misconduct in some one connected with the sale, unfairness of the officer who conducts the sale, some surprise or misapprehension on the part of those interested, or some irregularity in the proceedings, or other circumstances attending, conducing to show unfairness."

*Courtyards*, 594 S.W.3d at 209-10 (quoting *Smith v. Holowell*, 201 Ky. 271, 256 S.W. 408, 409 (1923)).

**Mistake**

The Lunsfords argue that the 2019 master commissioner sale should have been set aside and their deposit refunded on the basis of either mutual or unilateral mistake about the condition of the property. They assert that mutual mistake is applicable as all parties (except perhaps Wright) and the appraisers

-14-

mistakenly believed that the property was "habitable" and "had toilets, water heaters, cabinets, HVAC units, doors, etc." (Appellants' brief, p. 12.)

They also contend that even if their mistake was unilateral, equity calls for setting aside their contractual obligations regarding the sale, citing *Kane v. Hopkins*, 309 Ky. 488, 218 S.W.2d 37 (1949), which states:

> Equitable relief from a mutual mistake is frequently given by a reformation of the contract. But a contract will not be reformed for an unilateral mistake. Equitable relief may, however, be given from an [sic] unilateral mistake by a rescission of the contract. Essential conditions to such relief are: (1) The mistake must be of so grave a consequence that to enforce the contract as actually made would be unconscionable. (2) The matter as to which the mistake was made must relate to a material feature of the contract. (3) Generally the mistake must have occurred notwithstanding the exercise of ordinary diligence by the party making the mistake. (4) It must be possible to give relief by way of rescission without serious prejudice to the other party except the loss of his bargain. In other words, it must be possible to put him in statu [sic] quo.

*Id*. at 39-40 (quoting *Fields v. Cornett*, 254 Ky. 35, 70 S.W.2d 954, 957 (1934)).

The Lunsfords note that it would cost $96,000 to put the house back in the condition which "generated" their bid and assert the house's condition was a material feature of the contract. They also argue they exercised ordinary diligence by going into the house when given the opportunity[12] and that "Central Bank and

_____

[12] Again, Central Bank perceives the Lunsfords' entering the unlocked house before the sale as trespassing and suggests the Lunsfords should not, therefore, be permitted to rely on their

-15-

the others will not suffer serious prejudice since the house was resold in the same condition as the day of the first sale." (Appellants' brief, p. 13.)

The trial court rejected the Lunsfords' mistake argument, orally stating that the appraisal was accurate when issued–in mid-May 2019–prior to the partial destruction of the property a day or two before the sale. The trial court orally indicated there was no mistake in the appraisal–instead, there was an intervening criminal act which occurred between the appraisal and the sale.

Despite the Lunsfords' noting provisions in the order and notice of sale that risk of loss passed to the purchasers only upon confirmation, the trial court believed that the Lunsfords' obligation to perform was not excused due to the destruction of the property or any misunderstanding about the property's condition.

While slight misunderstandings about a property's qualities by a purchaser or appraisal may not generally justify setting aside a judicial sale, there is precedent for setting aside a sale where an appraisal is based on significant mistake of facts about the fundamental qualities of a property. *See Elswick v. Justice*, 287 Ky. 632, 154 S.W.2d 714 (1941). For example, where appraisers

observations. Whether the Lunsfords had actually trespassed is unclear–given an apparent lack of evidence of whether an owner or occupant permitted the entry. Neither the Lunsfords nor the appraisers explicitly stated whether they reviewed any information via public Property Valuation Administrator ("PVA") records which might have shed light on existing basic structures such as plumbing or heating and air systems. Even disregarding the Lunsfords' actual observations, however, one would not reasonably expect that most essential fixtures in a house would have been removed just before a sale–even a foreclosure sale.

admitted they had mistakenly understood the property for sale to consist of 70 to 80 acres when in fact the property covered about 176 acres and the property sold for about two-thirds the appraised value, the Kentucky high Court reversed the trial court's refusal to set aside the sale. *Id.* at 714-15.[13]

The Kentucky Court held that under these circumstances, the trial court should have sustained exceptions and set aside the sale due to the significance of the appraisers' mistake of **fact** rather than of **judgment**:[14]

> In the case before us the inadequate appraisement resulted from the mistake of the appraisers in valuing only part of the land to be sold, clearly a mistake of fact, which not only tended to affect the price received at the sale but also deprived appellants of their right of redemption. Under the circumstances, we think the court should have sustained the exceptions to the master commissioner's report of sale and set aside the sale.

*Id*. at 715.

---

[13] The property had sold for about twenty-five percent of its actual value but for two-thirds of its appraised value so that the owners' right of redemption was defeated. The Kentucky Court took note that the appraisers "did not appraise the land as an entirety, regardless of the acreage, but agreed on the value per acre and multiplied this by the number of acres they believed to be in the two tracts." *Id*. at 715.

[14] Central Bank cites *Mastin v. Zweigart*, 24 Ky. L. Rptr. 1920, 72 S.W. 750 (1903) (not officially reported) which states: "A mere mistaken opinion of the appraisers as to the value of the land does not affect sale." *Id*. at 750. The Kentucky Court there explicitly noted the lack of allegations of fraud concerning the appraisal and did not explicitly discuss any mistake of fact by the appraisers. The land sold for $18.25 an acre, despite the appraisal for court valuing it at $20 an acre and the appellant's affidavits of other appraisals valuing the property at $25 an acre. *Id*. at 750-51. The Kentucky Court characterized any mistake by the court appraisers as a mistake of judgment: "The evidence that the land was worth $25 per acre could not do more than to conduce to show that the appraisers erred in their judgment as to the value of the land." *Id*. at 750. So, there was no showing of a mistake of fact, rather than of judgment, as in *Elswick*.

Unlike *Elswick*, the right of redemption by an owner in foreclosure is not at stake here. And here a purchaser–rather than an original owner–challenges the appraisal as being much too high rather than much too low. But despite these distinctions, *Elswick* should be read to call for setting aside the May 2019 commissioner sale and/or rescinding the contract arising from this sale.

Even if the appraisal here was correct as of the date of its filing, the property as offered by sale on May 28, 2019 fundamentally differed from the appraisers' understanding of fundamental facts about the property. The appraisers admitted in affidavits that their mid-May 2019 appraisal was based on assumptions that the property had certain key fixtures–such as air conditioning, cabinetry, toilets and bathtubs, and sinks–and would have been significantly different if they knew such key fixtures had been ripped out.

Furthermore, their appraisal for the second master commissioner sale came in $110,000 lower–for $300,000 instead of $410,000. And the property sold at the second sale for a price ($250,000) much closer to their second appraisal than their first appraisal. As in *Elswick*, it is appropriate to accept that the appraisers essentially were laboring under a significant mistake of fact–not just judgment–in appraising the property as worth $410,000 at the date and time of the first sale.

And although *Elswick* involved the rights of owners to challenge a sale based on a too-low appraisal which defeated the right of redemption, our

precedent does not limit our consideration of significant inequities to only those affecting the original owners of property. Instead, precedent calls for considering justice and equity to all parties involved. *See, e.g.*, *Gross v. Gross*, 350 S.W.2d 470, 471 (Ky. 1961) (emphasis added) (citing *Kentucky Joint Land Bank of Lexington v. Fitzpatrick*, 237 Ky. 624, 36 S.W.2d 25, 26 (1931) ("the trial court and this court must have due regard for the rights of **all the parties involved** as measured by legal and equitable standards" so when a questionable sale price "is accompanied by circumstances, though only slight and insufficient in themselves, which tend to cause it, or where it is attended by apparent unfairness or impropriety or oppression on the part of those connected with the sale, the sale ought to be and will be set aside.")). It would be grossly unfair to require the Lunsfords to lose their deposit under these facts, given that they, like the appraisers, had no way to know of the theft of key fixtures just prior to the sale and that they promptly filed exceptions to the sale after discovering the theft.

## Fraud

The Lunsfords contend that the sale should be set aside based on fraud or misconduct by a person connected with the sale–namely, Nathan Wright (who did not directly participate in the proceedings below).[15] They note he was clearly

---

[15] The Lunsfords do not assert in their appellate briefs that the Bayers–who, like Wright, had money judgments to Central Bank awarded against them–might also have engaged in any fraud or misconduct.

connected with the sale as an owner of the property and party to the lawsuit.  And

they argue:

> Secretly taking all the fixtures out of the house just
> before the sale was both fraudulent and misconduct.  He,
> in essence, stole or destroyed what the Court ordered to
> be sold.  He concealed what he did by locking the doors.
> Neither the Lunsfords, the master commissioner, the
> attorneys nor the banks were aware of Mr. Wright's
> misconduct.

(Appellants' brief, p. 7.)

Central Bank argues in its brief that only fraud or misconduct on the

part of the master commissioner or other agent of the court would excuse a party

from performance.  But statements in authority it cites seem more relevant to

allegations of **irregularity or unfairness in proceedings** by the master

commissioner or other court agents–which is not alleged here–rather than fraud or

misconduct by a person connected to the sale.  *See* Appellee's brief, p. 8 (quoting

*Courtyards*, 594 S.W.3d at 210) ("errors in notice and other irregularities can be

grounds for setting aside a sale if the fault lies with the Master Commissioner

rather than one of the parties."). *See also Trigg*, 42 S.W. at 850 (cited by

Appellees to allow equitable relief for purchasers "deceived by the action of the

court or the misrepresentations of its agents . . . .") (indicating that relief may be

available to persons so deceived by a court or court's agents about the quantity of

land sold in case in which property was not actually as large as advertised for

-20-

judicial sale, but not expressly limiting relief for fraud to cases involving fraud by the court or its agents).[16]

Despite the perceptions or expectations of some people that foreclosed property will likely be damaged in some manner, we have not come across any reported Kentucky case addressing whether a judicial sale can or must be set aside due to intentional property destruction or removal of fixtures by a foreclosed-upon owner. But under the unique facts here, we believe the trial court erred in failing to recognize that such intentional misconduct or fraud could constitute extraordinary circumstances warranting an exception against applying the *caveat emptor* doctrine to bar relief for these purchasers.

### General Inequity

Although a questionable sales price standing alone might not warrant setting aside a judicial sale, setting aside a judicial sale may be warranted where the questionable sale price is accompanied by even slight indications of unfairness or impropriety by those connected with the sale. *Gross*, 350 S.W.2d at 471. Although ultimately the trial court's decision to set aside a sale was reversed in *Gross* due to lack of indications of impropriety and other factors, *id*. at 471-72,

---

[16] The purchaser in *Trigg* sought to obtain a reduction in the purchase price due to the acreage being less than advertised. 42 S.W. at 849. *Trigg* indicates that the purchaser could not get the requested relief–sales price reduction–in part due to his delay in filing exceptions until after confirmation and also indicates that he might have been entitled to rescission instead but refused this option. *Id.* at 850.

-21-

*Gross* did not involve issues of whether the sale should be set aside due to any sort of damage or destruction to property.

Central Bank argues that precedent establishes that partial destruction of the property prior to confirmation–even prior to the sale itself–does not excuse a purchaser in a judicial sale from performing their obligations given the general applicability of *caveat emptor* principles. As authority, it cites *Walters v. Blevins' Executor*, 3 Ky. L. Rptr., 11 Ky. Op. 309, 1881 WL 8036 (Ky. Oct. 29, 1881); *Vance's Administrator v. Foster*, 72 Ky (9 Bush) 389, 1873 WL 6643 (1872); and *Cook's Administrator v. Franklin Fire Insurance Company*, 224 Ky. 360, 6 S.W.2d 477 (1928). *Walters* concerned the removal of rails from property subject to a judicial sale. 11 Ky. Op. at 310.[17]

In *Vance's Administrator*, the Court noted that machinery had been **accidentally** partially destroyed by fire after its judicial sale but before the sale could be confirmed. 72 Ky. at 391. The Kentucky high Court reversed the trial

---

[17] The Court stated that although no defect in title was alleged, "the proof conduces to show that the rails were taken from the land before the sale. If taken after the sale the appellant would be compelled to take the property and look to the trespasser for reparation." 11 Ky.Op. at 309-10. The Court held that this indication of property destruction was insufficient to warrant setting aside the sale which was only of land within certain boundaries and not necessarily of a particular building which was the subject of an exception unless that building was within those boundaries. And it determined that the purchaser could have ascertained what was being sold by looking at the judgment and obtained proper title to land within the boundaries set forth in the judgment. So, the Kentucky Court upheld the trial court's confirmation of the sale. *Id*. at 310. The discussion of the facts indicates only that "rails were taken" and does not provide much background into other circumstances–such as who may have taken the rails and whether there were indications of intentional misconduct. *See id*. at 310.

court's refusal to confirm the sale, noting that neither party had been at fault for the accidental loss of property. *Id.* at 393.

In the *Cook's Administrator* case, the Kentucky Court did not explicitly indicate the destruction of property by fire occurred accidentally, but it also did not note any allegations of arson in its description of the facts. 6 S.W.2d at 478. Given its quotation of the discussion of accidental fire loss in *Vance's Administrator*, perhaps one could presume that the loss by fire in *Cook's Administrator* was also accidental.

Although these cases indicate destruction of property before confirmation did not merit setting aside the judicial sale, *Vance's Administrator* expressly notes that the partial property destruction occurred accidentally without fault by either party. And there is no explicit indication in any of these cases that they involved **intentional destruction of property by a party connected with the sale**–unlike the present case in which intentional destruction of property by a party connected with the sale has been not only alleged but also supported by evidence of record.

Also, the property destruction here apparently occurred prior to the sale as well as prior to the confirmation. Thus, we do not believe the holding of *Vance's Administrator* (which was quoted in *Cook's Administrator*) is apt.

*Vance's Administrator* states that equitable title passes with the sale–even prior to confirmation–and that a purchaser who is entitled to benefit by purchasing the property at the agreed-upon price should also be bound by his promise to pay that price where there is no valid ground to set aside the sale **at the time of the sale**:

> If it be true, as contended for the appellees, that their bids for the several parcels of machinery and their acceptance by the commissioner were not effectual for any purpose until approved by the court, and could have only operated to transfer the title, then, as from the time of confirmation, we readily concede that the loss sustained in this case should fall on the estate of Vance and not on the appellees. But in our opinion both the rights which the appellees acquired, and the responsibilities they incurred by becoming the accepted bidders for the property, greatly exceeded those resulting from mere proposals or offers to purchase subject to the approbation of the court. The principle can not [sic], we think, be questioned that where at the time a sale is made no valid ground for setting it aside exists the accepted bidder is entitled to his purchase, however much the property may appreciate in value between the sale and time for confirming it. This being so, why should he not be held bound by his purchase, although from accidental causes the property in the mean time [sic] may become impaired or depreciate in value?

*Id.* at 391-92. Here, in contrast, there was a valid reason to set aside the sale at the time of the sale–intentional damage which would cost almost $100,000 to fix and which resulted in the property's declining in value by around twenty-five percent–based on the difference between the two appraisals and two sale prices.

-24-

Another key distinction is that the trial court's judgment and order of sale here explicitly states that the risk of loss does not shift to the purchaser until confirmation. Central Bank argues in its brief that this does not mean the Lunsfords are entitled to their deposit. Instead, it contends that the order's risk of loss provision "merely retained all the rights of the owners and mortgage holders against third parties until such time as the sale was confirmed and final" to avoid the owners and mortgage holders being left without insurance coverage. (Appellee's brief, p. 13.)

Central Bank further argues: "Because the First Sale [the May 2019 master commissioner sale] was never confirmed, the risk of loss for the Property never shifted to Appellants [the Lunsfords] alone." (Appellee's brief, p. 14.) And so, the Lunsfords, in Central Bank's view, should only have to forfeit their deposit rather than being held liable for the $74,000 difference between the first and second sale prices. Central Bank does not cite any authority, however, for holding a purchaser's deposit forfeited where the sale is never confirmed.

Here, the trial court's judgment and order of sale plainly stated that the risk of loss shifted to the purchasers only upon confirmation. And the property was partially destroyed–apparently intentionally by a party connected with the sale–after the appraisal was prepared but before the sale actually occurred. Precedent indicating that purchasers at a judicial sale were bound despite

**accidental** partial destruction of property between the sale and confirmation is materially distinguishable from the case at hand.

### Evidentiary Hearing Not Necessarily Required Here

The Lunsfords argue that the trial court erred in denying their motion for an evidentiary hearing on their exceptions. They contend they must be given the chance to present evidence to prove their exceptions, citing *Burchett v. Bank Josephine*, 474 S.W.2d 66 (Ky. 1971). The Kentucky Court in *Burchett* held that the trial court erred in confirming the judicial sale before conducting an evidentiary hearing to provide the homeowners an opportunity to prove their exceptions **and to protect their right of redemption**:

> We are of the opinion that the trial court erred in confirming the report of sale after the exceptions had been filed without first having an evidentiary hearing on the factual issue of the value of the property. KRS 426.530 provides an owner the right of redemption in the event the property sold by judicial decree does not bring two-thirds of its appraised value. An insufficient appraisal could defeat the right of redemption by the owner. We are not saying that the appraisal of $40,000 is legally insufficient; we are saying that the trial court should have held an evidentiary hearing concerning the sufficiency of the appraisal.

*Id*. at 68. The Burchetts asserted the property was worth $160,000.

But unlike *Burchett*, the present case does not involve an owner's right of redemption so perhaps *Burchett* may not necessarily require an evidentiary hearing here. *See also Eagle Cliff Resort, LLC v. KHBBJB, LLC*, 295 S.W.3d 850,

852-53 (Ky. App. 2009) (indicating that *Burchett* calls for an evidentiary hearing "[w]hen a party whose redemption rights are at stake believes the appraisal of his property is inadequate in any way[.]").  Furthermore, we need not reach whether an evidentiary hearing is always required on exceptions which do not relate to the exercise of a right of redemption here–since this case could have and should have been resolved on the evidence in the written record here.

Under the facts here, an evidentiary hearing would have been futile as the trial court seemingly believed the Lunsfords were not entitled to a refund of their deposit even assuming that all their factual allegations were true.  And we are unaware of any expressly stated dispute of the allegations that Wright destroyed property and removed fixtures–even about the extent of the destruction–in the record.  Given this lack of significant factual dispute and evidence in the record supporting the Lunsfords' position, no evidentiary hearing is necessary but we direct the trial court to order return of the Lunsfords' deposit on remand.

As previously discussed, under the facts here, we conclude that the trial court abused its discretion in not totally setting aside the first sale and ordering the Lunsfords' deposit refunded.  It is fundamentally unfair under the unique facts of this case to require the Lunsfords to essentially have to pay almost half of the difference between the first and second sale prices–particularly as they did not delay in filing exceptions and seeking to set aside the sale.  *See Massey v. Fischer*,

245 S.W.2d 594, 595-96 (Ky. 1952) (trial court erred in confirming master commissioner sale where purchaser promptly filed exceptions upon discovering restrictions on property not noted in the master commissioner advertisement so she was entitled to rescission of the sales contract; *caveat emptor* does not bar setting aside a sale where valid objections concerning title problems are raised before confirmation since a sale contract is only executory when submitting the highest bid). *See also Trigg*, 42 S.W. at 850 (holding purchaser could not obtain requested relief of reduction in judicial sale price for misstated acreage due in part to his not objecting until after confirmation and indicating that rescission of the sale would have been available if purchaser had not refused this option).

While Central Bank understandably seeks payment of amounts owed to it by Wright and the Bayers, the Lunsfords should not have to forfeit their deposit under the facts here to satisfy Central Bank's judgments against Wright and the Bayers.

## CONCLUSION

For the foregoing reasons, we reverse and remand with instructions to enter an order returning the Lunsfords' deposit to them.

ALL CONCUR.

BRIEFS FOR APPELLANTS:

Richard M. Rawdon, Jr.
Georgetown, Kentucky

BRIEF FOR APPELLEE CENTRAL
BANK AND TRUST COMPANY:

Tyler Powell
Lexington, Kentucky